IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Eastern Division

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Case No.: 4:26-CR-00016-FL-RN |
| | ) | |
| James B. Comey, Jr., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## JAMES B. COMEY JR.'S MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS AND FOR *FRANKS* HEARING

**TABLE OF CONTENTS**

                                                                                                            **Page**

INTRODUCTION ....................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

      A.      Mr. Comey Posts A Picture On Social Media Depicting A Well-Known
              Political Slogan Opposing President Trump............................................................. 2

      B.      The Government Surveils And Investigates Mr. Comey...................................... 6

            1.      The Secret Service Conducts an Initial Investigation of Mr. Comey ........ 6

            2.      The FBI Continues to Investigate Mr. Comey.......................................... 8

ARGUMENT.......................................................................................................................... 12

I.      MR. COMEY IS ENTITLED TO A *FRANKS* HEARING. ............................................. 12

      A.      A *Franks* Hearing Is Required Upon a Substantial Showing That The Affiant
              Intentionally Misled the Magistrate....................................................................... 13

      B.      The Apple and Google Warrants Are Marred By Intentional False Statements
              and Material Omissions, Necessitating a *Franks* Hearing................................... 15

            1.      The Apple and Google warrants contained intentional
                   misrepresentations and omissions............................................................. 15

            2.      The false statements and omissions were material ................................. 22

CONCLUSION....................................................................................................................... 24

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Chatrie v. United States,*
609 U.S. __, 2026 WL 1855568 (U.S. June 29, 2026) ..........................................................24

*Franks v. Delaware,*
438 U.S. 154 (1978)............................................................................................... *passim*

*Illinois v. Gates,*
462 U.S. 213 (1983)..........................................................................................17, 18, 23

*Jackson v. Carin,*
128 F.4th 525 (4th Cir. 2025) ......................................................................................21

*Messerschmidt v. Millender,*
565 U.S. 535 (2012)....................................................................................................24

*Thompson v. Louisiana,*
469 U.S. 17 (1984)......................................................................................................13

*United States v. Bosyk,*
933 F.3d 319 (4th Cir. 2019) ................................................................................17, 23

*United States v. Colkley,*
899 F.2d 297 (4th Cir. 1990) ................................................................................ 14-15

*United States v. Glass,*
160 F.4th 563 (4th Cir. 2025) ..............................................................................13, 22

*United States v. Lull,*
824 F.3d 109 (4th Cir. 2016) ....................................................................14, 16, 19, 24

*United States v. Moody,*
931 F.3d 366 (4th Cir. 2019) ............................................................................ 13-15, 20

*United States v. Perez,*
393 F.3d 457 (4th Cir. 2004) ......................................................................................23

*United States v. Pulley,*
987 F.3d 370 (4th Cir. 2021) ......................................................................................19

*United States v. Tate,*
524 F.3d 449 (4th Cir. 2008) ....................................................................14, 22, 24

*United States v. Wharton,*
840 F.3d 163 (4th Cir. 2016) ....................................................................................14, 22

*United States v. Wilhelm*,
  80 F.3d 116 (4th Cir. 1996) ................................................................................19

**Constitution and Statutes**

U.S. Const. amend. IV .......................................................................................1, 13

18 U.S.C. § 871(a) ..................................................................................................17

**Other Authorities**

*8646 Impeach Biden T-Shirt*, Amazon.com (last visited July 26, 2026) .........................3

Andy Newman, *Mafia Turncoat Gets 20 Years for Running Ecstasy Ring*,
  The New York Times (Sep 7, 2002) ....................................................................11

Colby Hall, *Trump Rages at Comey 'Calling for Assassination' - Says Justice
  Department Will 'Handle It,'* Mediaite (May 16, 2025)............................................5

Devlin Barrett, *How the Drive to Find a Conspiracy Against Trump Rocked the
  Justice Department*, N.Y. Times (June 8, 2026)........................................................8

Donald Trump Jr. (@DonaldjTrumpJr), X (May 15, 2025, at 20:49 ET) .......................5

Gregory Svirnovskiy, *James Comey Sparks Republican Outrage with Trump
  Social Media Post*, Politico (May 15, 2025)..............................................................5

*Here Are 5 Takeaways from Trump's First Major Foreign Trip to the Middle
  East*, NPR (May 16, 2025).........................................................................................4

Josephine Harvey, *Kash Patel Rages at James Comey Over Cryptic Trump Post*,
  Daily Beast (May 29, 2025).........................................................................................5

Katelyn Caralle, *Top White House Officials Encouraged Potential Bondi Replacement
  to Make Case to Trump for AG Job: Sources*, Fox News (Apr. 11, 2026)..............10

Kristi Noem (@Sec_Noem), X (May 15, 2025, at 22:19 ET) ......................................5

*Subtle Anti Trump 8647 T-Shirt*, Amazon.com (last visited July 26, 2026)...................3

Violet Miller & Anna Savchenko, *Hands Off Protest in Downtown Chicago Draws
  Thousands Criticizing Trump's Policies*, WBEZ Chi. (Apr. 5, 2025) .....................3

*What Does 'Eighty-Six' Mean?*, Merriam-Webster........................................................3

# INTRODUCTION

The Fourth Amendment safeguards all Americans' privacy against arbitrary government invasions. It does so by generally requiring the government to obtain a warrant from a magistrate before conducting a search. Magistrates, in turn, must determine that the warrant is supported by probable cause—a task that relies upon the honest, forthright presentation of the facts by the government. Here, the government upended that constitutionally-mandated process by misleading the issuing magistrates about fundamental facts of the case.

In May 2025, Mr. Comey posted a picture on Instagram of seashells on a beach arranged in a pattern of "86 47"—a familiar slogan used to oppose President Trump. Over the following year, including after indictment in this case, the government obtained search warrants for various digital accounts associated with Mr. Comey and his wife. According to the affidavits submitted by the government in support of those warrants, Mr. Comey's Instagram post was a "true threat" against President Trump, a crime punishable by imprisonment, because Mr. Comey's experience prosecuting organized crime in the Southern District of New York would have made him aware that the term was a call for violence against the President. The inference that Mr. Comey was exposed to a supposedly violent alternative meaning of "86" during his prosecutorial days was thus central to the government's probable cause showing.

But the affidavits supporting the applications for those warrants—sought and issued ten and twelve months after the Instagram post, respectively—omitted facts known to the affiant that eviscerated that theory. The government had spent months poring over records of Mr. Comey's government service and interviewing people who worked on organized-crime cases more than thirty years ago. Those efforts, which preceded the government's applications for the warrants, failed to find *any* evidence proving that Mr. Comey learned that "86" means "kill" in the organized crime context—because it does not. And although the affidavits in support of the two

1

warrants claimed that a person who knew Patrice Comey ("Person-1")[1] "immediately" thought that the post had that macabre meaning, that person had zero insight into Mr. Comey's mental state and, in fact, had initially interpreted the term "86" to be restaurant lingo for running out of a food item. Moreover, Person-1 had been exposed to a false claim that "86" had been used to connote violence in specific cases Mr. Comey prosecuted. These inconvenient facts—all disproving the government's central theory, and all known to the agent who sought the warrants—appeared nowhere in the affidavits seeking to obtain the private digital records of Mr. Comey and his wife. Worse still, the affidavits also misled the magistrates with material falsehoods, bizarrely insinuating that Mr. Comey's lawyer (a former U.S. Attorney) and Mr. Comey's wife had obstructed the government's investigation.

Defendant James B. Comey, Jr., submits this motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) and to suppress the evidence derived from the warrants. Evidence obtained during discovery supports at least a substantial preliminary showing that the affidavits submitted in support of two of the search warrants contained intentionally false statements and material omissions, and that those defects vitiate any conceivable showing of probable cause. Mr. Comey is therefore entitled to a *Franks* hearing, and ultimately, to the suppression of the evidence derived from the warrants.

## STATEMENT OF FACTS

### A. Mr. Comey Posts A Picture On Social Media Depicting A Well-Known Political Slogan Opposing President Trump

On May 15, 2025, Mr. Comey encountered an arrangement of seashells on a public beach in North Carolina spelling out "86 47." Although Mr. Comey did not know who created the arrangement, he came to understand the phrase "86 47" as a clever way of expressing political

---

[1] This motion refers to the individual as "Person-1" and uses the pronoun "they" in order to protect the individual's identity.

2

opposition to President Trump. "86" is a slang term derived from the restaurant industry that means to "get rid of" or "throw out." *What Does 'Eighty-Six' Mean?*, Merriam-Webster, https://perma.cc/3KZD-9LXL. And "86 47"—with the "47" representing President Trump as the 47th President—is a common political slogan opposing the President. Many online retailers, like Amazon, sell items with the slogan "86 47," just as items featuring "86 46," "86 45," and "86 44" were sold to express opposition to previous presidents. *See, e.g.*, *Subtle Anti Trump 8647 T-Shirt*, Amazon.com, https://perma.cc/8NBA-9XCA (last visited July 26, 2026); *8646 Impeach Biden T-Shirt*, Amazon.com, https://perma.cc/W5JG-PZX8 (last visited July 26, 2026). And in early 2025, "86 47" signs, apparel, and flags were commonly displayed at anti-Trump protests around the country. *See, e.g.*, Violet Miller & Anna Savchenko, *Hands Off Protest in Downtown Chicago Draws Thousands Criticizing Trump's Policies*, WBEZ Chi. (Apr. 5, 2025), https://perma.cc/XHX7-7H7K.

Mr. Comey posted a photograph of the arrangement on the social media site Instagram accompanied with the comment "Cool shell formation on my beach walk":



comey ✓ ···

♡ 71 ▽ ⊞

**comey** Cool shell formation on my beach walk

Mr. Comey's description of the shell formation as "[c]ool" communicated his admiration for the way in which an anonymous person criticized President Trump. The post expressed nothing about Mr. Comey taking any action. Because Mr. Comey's post was on a public account, it was immediately visible to his nearly two hundred thousand Instagram followers and, more broadly, to Instagram's billions of users. It was not directed to President Trump. When Mr. Comey made the post, President Trump was travelling in Qatar and the United Arab Emirates, almost 7,000 miles from North Carolina. *Here Are 5 Takeaways from Trump's First Major Foreign Trip to the Middle East*, NPR (May 16, 2025), https://perma.cc/CLP5-KH5G.

After Mr. Comey publicly posted the image, supporters of President Trump immediately

4

attacked him for it.  Although some such supporters, like Federal Bureau of Investigation (FBI) Director Kash Patel, initially recognized the post as "a political stand," Josephine Harvey, *Kash Patel Rages at James Comey Over Cryptic Trump Post*, Daily Beast (May 29, 2025), https://perma.cc/Q3KN-MSC3, others suggested that the slogan "86 47" referred to violence against President Trump.  *See* Gregory Svirnovskiy, *James Comey Sparks Republican Outrage with Trump Social Media Post*, Politico (May 15, 2025), https://perma.cc/GRP3-7V9T.  For example, President Trump himself said Mr. Comey's post was "calling for assassination of the president."  Colby Hall, *Trump Rages at Comey 'Calling for Assassination' — Says Justice Department Will 'Handle It*,' Mediaite (May 16, 2025), https://perma.cc/FX3M-P8QU.  A former cabinet official to whom the Secret Service reported similarly asserted the post had "called for the assassination" of the President.  Kristi Noem, (@Sec_Noem), X (May 15, 2025, at 22:19 ET), https://perma.cc/H325-7CC5.  And the President's son remarked that Mr. Comey had "call[ed] for [his] dad to be murdered."  Donald Trump Jr., (@DonaldjTrumpJr), X (May 15, 2025, at 20:49 ET), https://perma.cc/3VRL-YARD.

Mr. Comey was not previously aware of any violent connotation of "86 47," which (as explained above) is a popular political slogan.  But based on the controversy stoked by his post, Mr. Comey deleted the post within hours.  After removing the post, Mr. Comey created another public post on Instagram, making clear that he was unaware that "86 47" could ever have a violent meaning:



comey ✓  Follow ···

♡ 4.2K  ⟲ 14  ⊽    ⊡
May 15, 2025

I posted earlier a picture of some shells I saw today on a beach walk, which I assumed were a political message. I didn't realize some folks associate those numbers with violence. It never occurred to me but I oppose violence of any kind so I took the post down.

That day, an unknown woman walked up to the house where Mr. Comey was staying, shouting and gesturing profanely. Mr. Comey contacted the local police chief to notify him about the controversy over the post. *See* Aff. of Patrick Fitzgerald filed concurrently herewith (Fitzgerald Aff.) ¶ 3.

## B.       The Government Surveils And Investigates Mr. Comey

The Secret Service began investigating and even surveilling Mr. Comey immediately, but the investigation's initial intensity soon petered out. *See* Mr. Comey's Mem. in Support of Mot. to Dismiss Indictment for Vindictive and Selective Prosecution at 10, 16-17. The FBI later took up the investigation. *See* Fitzgerald Aff. ¶ 15. And months later, in March and May 2026, FBI agents obtained two warrants to obtain records related to Mr. Comey's Apple account and Google accounts associated with Mr. and Ms. Comey.

### 1.       The Secret Service Conducts an Initial Investigation of Mr. Comey

Secret Service agents began investigating Mr. Comey within hours of the post. Agents interviewed Mr. Comey by telephone on the evening of May 15, 2025, and later that evening, they asked Mr. Comey to appear for a second interview the following day in Washington.

6

Fitzgerald Aff. ¶¶ 4, 8.  On May 16, 2026, as Mr. Comey and his wife, Patrice Comey, drove back to their home in northern Virginia, stopping at the grave of one of their children, federal agents tailed their vehicle and illegally tracked Mr. Comey's phone at the request of the "number three" person at the Department of Justice.  *See* Fitzgerald Aff. ¶¶ 5-7.  The following day, on May 17, 2025, Secret Service agents interviewed Patrice Comey, who explained that, based on her waitressing experience, she believed "86" was a restaurant term that meant discarding an item.  Fitzgerald Aff. ¶ 11.  She also explained that after Mr. Comey posted the photograph, Person-1 advised Ms. Comey that "86 47" could be interpreted as a call for violence, prompting Ms. Comey to search the term and inform Mr. Comey that some were asserting a violent alternative meaning.  *Id.*  Mr. Comey then deleted the picture and posted his explanation.

Approximately a week after the Instagram post, Mr. Comey's attorney, David Kelley, received an email from a Secret Service agent informally requesting, among other materials, the seashells photograph.  *See* Decl. of David N. Kelley (Kelley Decl.) ¶ 6.  Mr. Kelley responded within hours, attaching a screenshot of the picture taken by Mr. Comey.  The agent never expressed concerns about Mr. Kelley's email or requested further materials.  *Id.* ¶¶ 7-8.

Secret Service agents interviewed Person-1 in May 2025.[2]  The FBI first interviewed Person-1 in April 2026, two weeks prior to the indictment.  Person-1 admitted that they had been estranged from Mr. Comey and had not spoken to him for at least two years; Person-1 also made clear their intense bias against Mr. Comey, stating that they hoped Mr. Comey "goes to jail" for the "crimes that he committed" as FBI Director.  Fitzgerald Aff. ¶ 12.  They regretted that they did not "have more" to make the Comeys "face consequences."  *Id.*  Person-1 also described their assessment of Mr. Comey's mental state as "speculation" and "conjecture."  *Id.*  And

---

[2] The Secret Service conducted an unrecorded phone interview of Person-1 on May 17, 2025, and a more detailed, recorded in-person interview on May 21, 2025.  Fitzgerald Aff. ¶ 13.

although Person-1 indicated that they had left a prior career and entered "rehab," there were no follow-up questions about what issues led to the need to enter rehabilitation or whether those issues had been resolved. *Id.* ¶ 21.

In the two recorded interviews with the Secret Service (May 2025) and FBI (April 2026), Person-1 indicated that their first reaction ("initial thing") was to connect the term "86" only to its food-service meaning ("the only way I ever heard it"). *Id.* ¶ 13.[3] Person-1 then indicated that they thought about information outside of the post (such as their perception that impeachment was not plausible given the Republican control of Congress) and began to see the post differently. *Id.* Person-1 also explained that, after Mr. Comey's post, they had listened to a May 20, 2025 episode of Rudy Giuliani's online show, where Mr. Giuliani claimed that Mr. Comey had worked on organized crime cases in which mafia members used the term "86" to mean "kill," as reflected in tapes and transcripts. *Id.* ¶¶ 13-14. Thus, in Person-1's view, "there was no way [Mr. Comey] didn't know how that was at least going to be interpreted." *Id.* ¶ 13.

Although then-Deputy Attorney General Todd Blanche's deputies were reportedly pressing prosecutors in the Eastern District of Virginia to open an investigation of the seashells post, that Office declined to pursue the case. *See* Devlin Barrett, *How the Drive to Find a Conspiracy Against Trump Rocked the Justice Department*, N. Y. Times (June 8, 2026), https://perma.cc/8YZP-HEPR. Instead, on May 21, 2025, an Assistant U.S. Attorney in the Office for the Eastern District of North Carolina wrote to a Secret Service agent that "I've been ordered to open this case in EDNC." Fitzgerald Aff. ¶ 15.

### 2. The FBI Continues to Investigate Mr. Comey

The Secret Service shared its case file with the FBI in the fall of 2025, and the FBI

---

[3] The brief summary of Person-1's unrecorded initial telephonic interview indicated that Person-1 "immediately" understood the post to be a call for violence, but the recorded interviews contradict that assertion. *See* Fitzgerald Aff. ¶ 13.

continued to investigate Mr. Comey in fits and starts over the following six months.

**Failed "86" Searches.** In September 2025, at the request of a prosecutor in the Eastern District of North Carolina, FBI agents searched the Bureau's Sentinel database—which contains information relating to all FBI open and closed investigations—for any indication of direct association between Mr. Comey and records involving the use of the term "86." Fitzgerald Aff. ¶ 22. The search yielded "inconclusive results." *Id.* In November 2025, the FBI agent who would eventually apply for the at-issue warrants (the "case agent") requested a review of the FBI's case file for *United States v. John Gambino*, a sprawling criminal case involving a six-month trial that Mr. Comey prosecuted in the early 1990s. *See id.* ¶ 23. That file contained no references to the term "86" either. *See id.*

**Apple Search Warrant.** On March 23, 2026, the government obtained a warrant requiring Apple to disclose private information related to Mr. Comey's Apple ID account, including search and browser history, call records, and the contents of messages from the time period surrounding the Instagram post. *See* Exhibit A, Application for March 23, 2026 Search Warrant (Apple Warrant). The affidavit in support of the search warrant application described Mr. Comey's Instagram post and stated that the term "86" has "[m]ore recently . . . been attributed to an organized crime context, in which it refers to taking someone 'eight miles out of town' and putting them 'six feet under.'" Apple Warrant Aff. at 12-13. The affidavit went on to note that Mr. Comey handled "serious crimes of violence committed by organized criminal organizations" while he was a prosecutor. *Id.* at 13. Yet the case agent omitted mention of the FBI's failed efforts to substantiate that link. The affidavit also described Secret Service agents' first May 2025 interview of Person-1, stating that although Person-1 "was familiar with the term '86' meaning that a restaurant was out of food . . . [Person-1] *immediately perceived* the term '86

9

47' as a call to get rid of, in a violent way, or even to assassinate President Trump." *Id.* at 18. (emphasis added). "Based on Comey's extensive experience as a lawyer and with the FBI, [Person-1] felt Comey must have known that '86 47' was a call for violence." *Id.* Finally, as relevant here, the affidavit claimed that Mr. Comey's counsel, Mr. Kelley, had employed a tactic commonly used "to hide metadata associated with the original images." *Id.* at 17. In response to a Secret Service agent's request for the photograph taken by Mr. Comey, Mr. Kelley "[n]otably . . . did not send the original photo of the shell formation," but rather a screenshot. *Id.*

*Renewed Government Investigative Efforts and Indictment.* The FBI's investigation gained new momentum in April 2026—shortly after President Trump fired Attorney General Pamela Bondi, who had overseen the failed prosecution of Mr. Comey in the Eastern District of Virginia, and the President reportedly instructed Acting Attorney General Todd Blanche to consider his work to be an "audition." Katelyn Caralle, *Top White House Officials Encouraged Potential Bondi Replacement to Make Case to Trump for AG Job: Sources*, Fox News (Apr. 11, 2026), https://perma.cc/6YM9-FWZ8. On April 13, 2026, FBI agents interviewed Person-1 for the first time, and, as explained above, Person-1 reiterated that their first association with the term "86" was from their experience in food service, but that they "quickly" concluded that the term could also have a violent connotation. Fitzgerald Aff. ¶ 16. At no point did Person-1 claim that they viewed Mr. Comey's post as a personal threat to commit violence against the President. *Id.* ¶ 21.

The government also redoubled its efforts to link Mr. Comey's decades-long government service to the term "86." That month, at the request of the case agent and the First Assistant U.S. Attorney for the Eastern District of North Carolina, FBI agents repeatedly searched the *Gambino* trial transcripts for references to "86." Once again, the searches yielded no results. Fitzgerald

10

Aff. ¶¶ 25-26.

A grand jury indicted Mr. Comey on April 28, 2026. Dkt. 1. FBI agents then conducted additional interviews and searches to attempt to link Mr. Comey to the claimed organized crime usage of the term "86." In May 2026, an FBI agent and the First Assistant interviewed Salvatore Gravano, a former member of the Gambino crime family and key government cooperator in the *Gambino* trial, who was involved in the murder of at least nineteen people, among other crimes.[4] Fitzgerald Aff. ¶ 32. Mr. Gravano did not recall ever discussing the term "86" with Mr. Comey, or otherwise ever hearing the term uttered in connection with trial. While Mr. Gravano claimed that all law enforcement agents would be familiar with the term's alternative organized crime meaning referring to murder, he also claimed that a "gangster would never use that term" because they knew that law enforcement knew what the term meant. *Id*. As with Person-1, Mr. Gravano did not indicate that he understood the seashells post to be a threat by Mr. Comey to carry out violence personally. *Id.*

The case agent also interviewed two retired FBI agents who had each spent decades investigating organized crime, specifically including the Gambino crime family, but neither recalled instances of "86" being used to reference murder. Fitzgerald Aff. ¶¶ 27-28. Meanwhile, FBI agents continued searching for "86" in public records. At the specific direction of the U. S. Attorney, agents searched Mr. and Ms. Comey's social media accounts for use of the term, which yielded no results. *See id.* ¶ 31. And at the direction of the U.S. Attorney, they also conducted open-source and artificial-intelligence queries of the term "86," yielding mixed

---

[4] Mr. Gravano's criminal career did not end in New York. He started a new life in Arizona, where he soon became involved in a multimillion-dollar drug trafficking conspiracy with his wife, son, and daughter that landed him back in federal prison. *See* Andy Newman, *Mafia Turncoat Gets 20 Years for Running Ecstasy Ring*, The New York Times (Sep 7, 2002), https://perma.cc/PQ28-WAED.

results. For example, an AI-generated search result stated that the theory that the term "86" originated in organized crime was really an "urban legend." *Id.* ¶¶ 29-30.

***Google Search Warrant.*** On May 20, 2026, the government obtained a warrant requiring Google to disclose information related to Gmail accounts held by Mr. and Ms. Comey. *See* Exhibit B, Application for May 20, 2026 Search Warrant (Google Warrant). Here, too, the affidavit summarized Mr. Comey's Instagram post, claimed that "86" has violent connotations originating in organized crime, and noted Mr. Comey's extensive experience prosecuting organized crime. Google Warrant Aff. at 18-19. As with the affidavit in support of the Apple warrant, the case agent omitted the government's increasingly extensive (and failed) efforts to substantiate the link between Mr. Comey's government service and his awareness of a claimed alternative, violent meaning of the term "86" in the organized crime context. The affidavit also repeated the Apple warrant affidavit's summary of the first interview of Person-1, stating that they "immediately perceived Comey's post to contain a violent meaning." *Id.* at 24. And, once again, there was no discussion of Person-1's lack of direct contact with Mr. Comey for years or their prior stint in rehabilitation. In addition, the case agent stated that Ms. Comey sent Mr. Comey a screenshot of a benign definition of the term "86" two minutes before Mr. Comey uploaded the post—which the affidavit portrayed as contradicting Ms. Comey's statement to the Secret Service that she performed a Google search of the term after receiving a message from Person-1. *Id.* at 27-28.

## ARGUMENT

## I.     MR. COMEY IS ENTITLED TO A *FRANKS* HEARING.

The warrants issued to search digital accounts connected to Mr. and Ms. Comey were issued on the basis of affidavits designed to mislead the issuing magistrates. Evidence obtained during discovery reveals that the case agent acted with at least recklessness when she omitted

material facts disproving that Mr. Comey was aware of a violent alternative meaning of "86," and included reckless insinuations that Mr. Comey's attorney and wife had obstructed the government's investigation. Mr. Comey is entitled to a *Franks* hearing upon this "substantial preliminary showing." *Franks v. Delaware*, 438 U.S. 154, 155 (1978).

### A. A *Franks* Hearing Is Required Upon a Substantial Showing That The Affiant Intentionally Misled the Magistrate

The Fourth Amendment's Warrant Clause protects individual privacy and liberty by "requir[ing] the interposition of a neutral and detached magistrate between the police and the 'persons, houses, papers, and effects' of citizens." *Thompson v. Louisiana*, 469 U.S. 17, 20 (1984) (citation omitted). It is "the magistrate who must determine independently whether there is probable cause" to conduct the search, and that determination requires the affiant to "set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks*, 438 U.S. at 165. The warrant process thus depends on the "'informed and deliberate determinations' by neutral and detached magistrates about the reasonableness, and therefore the lawfulness, of searches." *United States v. Glass*, 160 F.4th 563, 568 (4th Cir. 2025) (citation omitted). When an affiant interferes with the magistrate's deliberations by deliberately or recklessly falsifying the affidavit in support of the warrant, the affiant short-circuits the Warrant Clause's required process, reducing it to "a nullity." *Franks*, 438 U.S. at 168.

Defendants are thus entitled to a hearing to attack the validity of an affidavit upon a "substantial preliminary showing" that "(1) law enforcement made a false statement; (2) the false statement was made knowingly and intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to the finding of probable cause." *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019) (quotations omitted). The same analysis applies "when an agent

13

*omits* relevant facts from the affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016).

To show falsity, a defendant must demonstrate that "the statements at issue are objectively false" using "affidavits or other evidence." *Moody*, 931 F.3d at 370. Next, a defendant satisfies the "'intentionality' prong under *Franks,*" *Lull*, 824 F.3d at 115, by demonstrating that the affiant "subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate," *Moody*, 931 F.3d at 371. Among other factors, "the significance—or insignificance—of a particular omission to the determination of probable cause may inform [the court's] conclusion regarding the agent's intent," because when a fact is crucial for the probable cause determination, "the relevance of this information should have been obvious" to the affiant. *Lull*, 824 F.3d at 117. Finally, courts assess materiality by "insert[ing] the facts recklessly [or intentionally] omitted, and then determin[ing] whether or not the corrected warrant affidavit would establish probable cause." *United States v. Wharton*, 840 F.3d 163, 169 (4th Cir. 2016) (quotations omitted). "[T]o be material under *Franks*, an omission 'must be such that its inclusion in the affidavit would defeat probable cause.'" *United States v. Tate*, 524 F.3d 449, 457 (4th Cir. 2008). Omissions are particularly likely to be material when the omitted facts "cast[] doubts on the inherent validity (whether through unreliability, illegality, etc.) of any information in the original affidavit." *Wharton*, 840 F.3d at 170 (emphasis omitted).

Once a defendant makes a "substantial preliminary showing," he is entitled to an evidentiary hearing. *Tate*, 524 F.3d at 457 (emphasis omitted). If the "affiant's material perjury or recklessness is established by a preponderance of the evidence" at the hearing, then "the warrant 'must be voided,'" resulting in the exclusion of evidence gathered pursuant to the warrant. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S.

14

at 156).

    **B.**    **The Apple and Google Warrants Are Marred By Intentional False Statements and Material Omissions, Necessitating a *Franks* Hearing**

    **1.**    **The Apple and Google warrants contained intentional misrepresentations and omissions**

The affidavits in support of the Apple and Google Warrant applications omitted several material facts and even contained outright false statements. Extrinsic evidence disproves the government's bedrock theory that Mr. Comey would have known from his organized crime prosecutions that "86" means "to kill." First, a leading Brooklyn federal prosecutor who personally tried John Gotti twice before becoming a federal judge definitively refutes that theory. *See* Affidavit of John Gleeson dated July 23, 2026. Second, public statements by Rudolph Giuliani, who became famous for his own role in leading organized crime prosecutions in Manhattan, also confirm that he "didn't know what it ['8647'] meant." *See* Fitzgerald Aff. ¶ 14. Their views are entirely consistent with the government's inability to find any evidence that Mr. Comey would have understood "86" to mean "kill" in the organized crime context despite trying numerous times. And evidence obtained during discovery supports a substantial preliminary showing that the case agent swore out both affidavits with the "intent to mislead," or at least with "reckless disregard for whether the statements would mislead," the issuing magistrates. *Moody*, 931 F.3d at 371.

*First*, the case agent acted at least recklessly when she omitted information disproving the government's theory that Mr. Comey must have known that "86" can mean "kill" based on his experience prosecuting organized crime. Both affidavits advanced this theory, pointedly noting the purported origins of the violent use of "86" in organized crime and Mr. Comey's relevant work experience. Apple Warrant Aff. at 18; Google Warrant Aff. at 18-19. But conspicuously absent from the affidavits was *any* mention of the government's repeated searches of law

15

enforcement and case files, as well as voluminous organized-crime trial transcripts, to substantiate that connection—an omission that is all the more egregious because all of those investigations supported Mr. Comey's assertion that he did not recall ever hearing "86" used to mean "kill" during his prosecutorial days.

The Fourth Circuit has explained that when an affiant omits information from a warrant application, that omission is particularly likely to be intentional when there is "temporal proximity" between the affiant's discovery of the information and her "decision to omit information from the affidavit." *Lull*, 824 F.3d at 116. Here, the case agent not only knew about the FBI's failed searches—she had personally ordered them in November 2025 (preceding the Apple warrant) and April 2026 (preceding the Google warrant). *See supra* at pp. 9-10. The case agent also personally interviewed former FBI investigators who had worked on organized-crime cases; her interview with the investigator who stated he had never understood the term "86" to mean "kill" occurred just two weeks before the case agent applied for the Google warrant. Fitzgerald Aff. ¶¶ 27-28. The fact of the FBI's unsuccessful efforts to prove that Mr. Comey understood that "86" could mean "kill" would have plainly been "fresh in [the case agent's] mind." *Lull*, 824 F.3d at 117.

Furthermore, "[t]he relevance of the omission . . . to the determination of probable cause" provides another clue about the case agent's intent. *Lull*, 824 F.3d at 117. The more relevant the omitted information, the more likely the affiant's omission is intentional, because "the relevance of this information should have been obvious to" the affiant. *Id.* And the government's inability to substantiate its suggestion that Mr. Comey learned about the term "86" through his prosecution experience was extremely relevant. Mr. Comey has consistently—in his same-day Instagram post and repeated interviews with Secret Service agents—explained that he was

16

unaware that "86" could mean "kill" when he posted the photograph. *See supra* at pp. 5-6. Yet, to find probable cause, the magistrates who issued the warrants would have had to conclude there was a "fair probability" that Mr. Comey committed the crime of "knowingly and willfully" making a true threat against the President. 18 U.S.C. § 871(a); *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Mr. Comey's intent thus formed the heart of the probable-cause determination. The case agent knew this, because both of her affidavits in support of the Apple and Google warrants explained that she sought evidence "to identify [Mr. Comey's] knowledge of the meaning behind '86.'" Apple Warrant Aff. at 21; Google Warrant Aff. at 38. *See also* Apple Warrant Aff. at 33-34; Google Warrant Aff. at 36, Attach. B at 4. And the case agent's repeated efforts to find evidence to support the government's theory makes clear that the case agent appreciated that information about Mr. Comey's knowledge of the term was material.

The government failed to disclose that its May 2026 interview of Mr. Gravano, the former organized crime cooperator, confirmed that Mr. Gravano had no memory of discussing the term "86" with Mr. Comey. And Mr. Gravano's speculation that every law enforcement officer would know that "86" can mean "kill" was contradicted by former FBI agents and the repeated, unsuccessful searches of FBI records and other sources.[5] Indeed, one of those searches clarified that the idea that "86" is "attributed to an organized crime context," as the affidavit claimed, *see* Google Warrant Aff. at 18, was an "urban legend." Fitzgerald Aff. ¶ 30. Weighing the evidence, including the reliability of the sources of that evidence, to determine whether there

---

[5] When asked who else would be an authority to speak to about this issue, Mr. Gravano indicated that John Gleeson, the former prosecutor and federal judge, was "brilliant." He added that an opinion "coming out of his mouth would be unbelievable." *See* Fitzgerald Aff. ¶ 32. Mr. Gleeson, for his part, attests that "[t]he term '86' in any form … is not part of the mafia lexicon at all, let alone used as a reference to killing someone." Affidavit of John Gleeson dated July 23, 2026 ¶ 4.

is probable cause is a constitutionally required task for the magistrate—not the affiant. *See Gates*, 462 U.S. at 239-40. And, in any event, the evidence from the FBI's investigations into its own files exculpated Mr. Comey at the time the case agent omitted mention of those investigations in the application for the Apple warrant.

*Second*, both affidavits distorted Person-1's statements to government investigators. The affidavits averred that Person-1 "immediately perceived Comey's post to contain a violent meaning." Apple Warrant Aff. at 18; Google Warrant Aff. at 24. But Person-1's own statements, which the case agent omitted from the affidavits, contradict this account. In a transcribed interview from May 21, 2025, Person-1 stated that their "first initial" thought was to interpret "86" as being "out of something on the menu," but that they eventually concluded that Mr. Comey's message must have been a "call to violence." Fitzgerald Aff. ¶¶ 12-13. And in that same interview, Person-1 noted that they had listened to an episode of Mr. Giuliani's show, where Mr. Giuliani claimed that the term "86" appeared in transcripts and tapes from organized-crime cases prosecuted by Mr. Comey—a claim that the FBI had determined to be false, but that Person-1 believed to support their conclusion. Indeed, the case agent reminded Person-1 in the April 2026 interview that Mr. Giuliani's May 2025 statements "referenced specific mob cases that Comey worked on when he was a prosecutor in New York, and that there were several logs of videotapes and phone calls where the mobsters were saying 'we've got to 86 this guy.'" *Id.* ¶ 17. But the case agent did not tell Person-1 that Mr. Giuliani's statement was proven untrue by the FBI's own investigation. Instead, the case agent reinforced Person-1's opinion that Mr. Comey most likely "knew" the sinister meaning of "86."[6]

---

[6] In a similar vein, when Person-1 speculated that the Comeys had only decided to claim for the sake of media appearances that Ms. Comey's restaurant expertise informed her

18

Worse still, the affidavit in support of the Apple warrant included another omission related to Person-1: that affidavit studiously avoided mentioning Person-1's utter lack of credibility. The case agent portrayed Person-1 as someone socially connected to the Comeys—and who therefore might have insight into Mr. Comey's thinking—and who believed Mr. Comey "must have known that '86 47' was a call for violence" due to Mr. Comey's "extensive experience as a lawyer and with the FBI." Apple Warrant Aff. at 18. What the affidavit failed to acknowledge was Person-1's express bias against Mr. Comey—including their pointed desire that "Jim goes to jail," *see* Fitzgerald Aff. ¶ 12—and years-long estrangement from Mr. Comey. Person-1 therefore lacked any personal insight into Mr. Comey's thinking. Nor did the affidavit disclose Person-1's issues leading to their need to enter rehabilitation. Because any experienced investigator would "surely know that reliability is 'key' to a magistrate's probable cause analysis when the search warrant application contains information provided by an informant," *Lull*, 824 F.3d at 116 (quoting *United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996)), the case agent's omission of indicia of Person-1's lack of reliability is particularly likely to have been intentional.[7] This is especially so where the FBI did not "independently corroborate[]" Person-1's speculation—in fact, the FBI debunked it. *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021).

*Third*, the affidavit in support of the Apple warrant falsely implied that Mr. Comey's attorney Mr. Kelley obstructed the investigation. The case agent averred that it was "notabl[e]" that Mr. Kelley responded to an investigator's informal request for "the photograph taken on the

---

interpretation of "8647," the case agent reinforced that belief despite having documentary proof it was not true. Fitzgerald Aff. ¶ 19.

[7] The defense is aware of additional impeachment material relating to Person-1, but we do not rely upon that as discovery to date gives no reason to believe the case agent was aware of that information.

beach of the seashells" with a screenshot of the photograph, because the agent was "familiar with the method of sending screenshots of photographs rather than the original photos as an attempt to hide metadata associated with the original images." Apple Warrant Aff. at 17. But the case agent's startling suggestion that Mr. Kelley—a longtime federal prosecutor and former U.S. Attorney—deliberately concealed evidence from investigators was plainly false. The Secret Service investigator who requested the photograph never asked for the original file, even in response to Mr. Kelley's email containing the screenshot. *See* Kelley Decl. ¶¶ 6-8. And the timestamp and location, which are clearly visible in the screenshot itself, are consistent with Mr. Comey telling investigators the truth about when and where he captured the original photograph—on Emerald Isle, at 1:56 p.m. on May 15, 2025. Apple Warrant Aff. at 17. Far from obstructing the investigation, Mr. Comey and Mr. Kelley were polite, cooperative, and responded quickly and completely to the investigators' requests for the items. *See* Kelley Decl. ¶¶ 3-7.

In suggesting that Mr. Kelley "attempt[ed] to hide metadata," Apple Warrant Aff. at 17, the case agent acted with at least "reckless disregard for the truth," *Moody*, 931 F.3d at 370. The case agent appears to have drafted the affidavit without even speaking with the Secret Service agent who requested the photograph from Mr. Kelley. Only a month *after* obtaining the Apple warrant did the case agent interview the Secret Service agent, who admitted that he "could not recall" if investigators asked Mr. Comey and Mr. Kelley for "the actual image" during Mr. Comey's in-person interview on May 16, 2025. Fitzgerald Aff. ¶ 41. Nor did the Secret Service agent know if any other law enforcement officer had asked Mr. Kelley for the actual file; the agent himself admitted "he did not do so." *Id.*

The case agent drafted an affidavit that recklessly implied, under oath, that Mr. Kelley was hiding evidence from investigators. That attest-first, investigate-later approach is particularly reckless in light of the sluggish timeline of this investigation. Unlike many *Franks* challenges involving affidavits using "early information" where "[t]ime was of the essence," *Jackson v. Carin*, 128 F.4th 525, 538 (4th Cir. 2025), the case agent drafted the affidavit in support of the Apple warrant *ten months* after Mr. Comey's Instagram post. That was plenty of time to investigate and determine whether Mr. Kelley had ever been asked for the original file he supposedly "hid"—making the case agent's inclusion of this false statement at least reckless.

*Fourth*, the affidavit in support of the Google warrant falsely implied that Patrice Comey lied to investigators. The affidavit stated that on May 15, 2025, two minutes before Mr. Comey uploaded the seashell post, his wife sent him a screenshot of a website defining "86" to mean that an "item is out of stock" in a restaurant. Google Warrant Aff. at 27. The affidavit went on to say that during her Secret Service interview "Patrice admitted that she performed a Google search of the term, but stated she did so *after* [Person-1] … made her aware that the term '86' could be interpreted in a violent manner," *id.* (emphasis added)—implying that Ms. Comey lied about the timing of her Google search. That implication is false. Ms. Comey told investigators that she conducted a Google search of "86 47" after hearing from Person-1. *See id.* at 28 (showing screenshot of Google search results sent in response to Person-1's message). During her unrecorded, eleven-minute telephonic interview, there is no evidence that Ms. Comey ever stated to agents that the Google search prompted by Person-1 was the *only* search she conducted. Fitzgerald Aff. ¶ 11.

By implying that Ms. Comey lied about her Google search history, the government manufactured probable cause to search Ms. Comey's Google account—even though the case

agent was aware that Ms. Comey had conducted later Google searches.  Fitzgerald Aff. ¶ 20.

Indeed, the FBI had multiple copies of the later searches.  *See id.*  The case agent herself directly

received one copy of a text chain conclusively establishing later searches when she interviewed

Person-1.  *Id.*  As with the case agent's false statement about Mr. Kelley's supposed concealment

of evidence, the usual explanation that the affidavit was drafted in the midst of "an urgent,

ongoing criminal investigation" simply does not apply here.  *Glass*, 160 F.4th at 568.  To the

contrary, the case agent sought the Google search warrant *after* Mr. Comey's indictment.  The

case agent's inclusion of this false statement more than a year after Mr. Comey's Instagram post

(and Ms. Comey's at-issue searches) supports a conclusion of intentionality.

### 2.       The false statements and omissions were material

The omissions and misrepresentations that marred the Apple and Google warrants were

also material.  When the information omitted by the case agent is "included" in the affidavits,

that information "defeat[s] a probable cause showing."  *Tate*, 524 F.3d at 455.  And when the

false statements included in the warrant are "set to one side, the affidavits['] remaining content is

insufficient to establish probable cause."  *Franks*, 438 U.S. at 156.

The case agent's omissions related to Mr. Comey's understanding of the meaning of "86"

suffice on their own to warrant a *Franks* hearing.  As explained *supra* at pp. 16-17, the allegation

that Mr. Comey intended the term "86" to refer to violence formed the core of the magistrates'

probable-cause determinations.  Yet only two assertions in the affidavits supported the inference

that Mr. Comey knew this supposed alternative meaning of "86": (1) that Mr. Comey handled

criminal prosecutions involving organized crime, which is the purported origin of the use of "86"

to mean "kill," *see* Apple Warrant Aff. at 12-13; Google Warrant Aff. at 18-19, and (2) that

Person-1 "immediately perceived" Mr. Comey's post as a call for violence, Apple Warrant Aff.

at 18; Google Warrant Aff. at 24.  The case agent's omissions were material because they

"undermined the foundational core of the affidavit," "cast[ing] doubt on the inherent validity" of both bases for the government's central inference. *Wharton*, 840 F.3d at 169-70 (emphasis omitted). The government's inability to find a single confirmed instance in which Mr. Comey worked on a case where the term "86" was used to mean "kill" across its comprehensive files, databases, and interviews—including the record of the six-month-long *Gambino* trial—disproves the inference that Mr. Comey's professional background would have primed him to understand "86" to implicate violence. And the fact that Person-1 was estranged from Mr. Comey, thus lacking any personal insight into Mr. Comey's mental state, meant that their "speculation" about Mr. Comey's intent was based on nothing more than the same (disproven) inference— aggravated by Person-1's exposure to inaccurate statements by Mr. Giuliani. Correcting the affidavits to include those omitted facts makes plain that the affidavits did not "support a reasonable inference" that Mr. Comey knowingly threatened the President, and the corrected affidavits therefore fail to establish probable cause. *Bosyk*, 933 F.3d at 325.

The omission of Person-1's extreme bias from the Apple warrant is material for a second reason: information about the credibility of Person-1 whose hearsay purportedly supports the probable cause showing is crucial to a magistrate's ability to assess the strength of the affidavit. Indeed, "a judicial officer's assessment of probable cause based upon the totality of the circumstances *must* include a review of 'the veracity' and 'basis of knowledge' of persons supplying hearsay information." *United States v. Perez*, 393 F.3d 457, 461-62 (4th Cir. 2004) (quoting *Gates*, 462 U.S. at 238) (emphasis added). The affidavit in support of the Apple warrant's omission of Person-1's animus toward Mr. Comey, including their stated desire to see Mr. Comey incarcerated, was therefore "necessary to the [neutral and disinterested magistrate's] finding of probable cause." *Franks*, 438 U.S. at 156.

23

Additional material misrepresentations in the affidavits confirm that a *Franks* hearing is necessary. The affidavits in support of the Apple and Google warrants both relied in part on misrepresentations to convince the magistrates that the warrants would reveal information deliberately hidden from investigators—the metadata of the seashells picture purportedly hidden by Mr. Kelley and timing of Google searches purportedly hidden by Ms. Comey, respectively. Of course, neither Mr. Kelley nor Ms. Comey had deceived investigators. But the case agent's suggestions of foul play buttressed the contention that there was a "fair probability" that "the place searched will have the materials sought and that those materials will contain evidence 'aid[ing]' in a criminal's . . . 'conviction.'" *Chatrie v. United States*, 609 U.S. __, 2026 WL 1855568, at *17 (U.S. June 29, 2026) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 552 n.7 (2012)).[8] "[S]et[ting] to one side" those misrepresentations and including the omitted information that related to Mr. Comey's state of mind results in affidavits that fall well short of establishing probable cause. *Franks*, 438 U.S. at 156. To the contrary, corrected affidavits would portray innocuous political speech that could be painted as a potential threat only by unfounded speculation and suggestions of culpability that the government's own investigation refuted. *Id*. These material omissions and misrepresentations merit a *Franks* hearing. *See, e.g.*, *Tate*, 524 F.3d at 457; *see also Lull*, 824 F.3d at 120 (holding defendant satisfied *Franks* after hearing).

## **CONCLUSION**

For the foregoing reasons, Mr. Comey is entitled to a *Franks* hearing.

---

[8] The case agent's repeated characterization of Mr. Comey's subsequent post explaining his deletion of the photo as an "apology"—when it was nothing of the sort—was just another way to buttress the woefully inadequate applications.

Dated: July 28, 2026

Respectfully submitted,

JAMES B. COMEY, JR.
By Counsel

/s/   Joseph Zeszotarski
Joseph E. Zeszotarski , Jr.
(N.C. Bar No. 21310)
Gammon & Zeszotarski, PLLC
P.O. Box 1127
Raleigh, NC 27602
Telephone: 919-521-5878
jzeszotarski@ghz-law.com

*Local Rule 57.1 Counsel for Defendants*

Patrick J. Fitzgerald*
(Mich. Bar No. P86579)
P.O. Box 277
New Buffalo, MI 49177
Telephone: (312) 758-4454
patrickjfitzgeraldlawoffice@gmail.com

/s/   Ephraim A. McDowell
Ephraim A. McDowell*
(D.C. Bar No. 1631429)
Alexander J. Kasner*
(Cal. Bar No. 310637)
Elias S. Kim*
(D.C. Bar No. 1673678)
Dev P. Ranjan*
(D.C. Bar No. 90019329)
COOLEY LLP
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
emcdowell@cooley.com
akasner@cooley.com
ekim@cooley.com
dranjan@cooley.com

Rebekah Donaleski*
(N.Y. Bar No. 4986246)
COOLEY LLP
55 Hudson Yards
New York, NY 10001

25

Telephone: (212) 479-6000
rdonaleski@cooley.com

Michael R. Dreeben*
(D.C. Bar No. 370576)
600 New Jersey Ave. NW
Washington, DC 20001
Telephone: (202) 695-2562

**\*Special Appearance pursuant to Local Criminal
Rule 57.1(e)*

*Counsel for Defendant James B. Comey, Jr.*

26

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 28th day of July, 2026, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/   *Ephraim A. McDowell*
Ephraim A. McDowell

*Counsel for Defendant James B. Comey, Jr.*

27