**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

No. 4:26-CR-00016-FL-RN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES B. COMEY, JR. | )<br>)<br>)<br>)<br>)<br>)<br>) | **THE UNITED STATES' RESPONSE IN OPPOSITION TO JAMES B. COMEY JR.'S MOTION FOR DISCLOSURE OF GRAND JURY PROCEEDINGS** |

## INTRODUCTION

The Court should deny Defendant James B. Comey, Jr.'s Motion for Disclosure of Grand Jury Proceedings [DE 37] in its entirety. Comey comes nowhere close to making the strong showing of particularized need required to overcome the robust presumption of regularity to which grand jury proceedings are entitled or to justify breaking the secrecy of the grand jury proceedings in this case.

The two "independent grounds" that Comey argues justify disclosure of grand jury materials do nothing of the sort. First, neither of his motions to dismiss creates any inference that irregularities in the grand jury proceedings warrant dismissal. Comey's vindictive and selective prosecution arguments concern the decision to indict, not the presentation to the grand jury. And in any event, in trying to show that animus "infected" the line prosecutor's presentation, Comey relies only on a theory of imputed animus that the Fourth Circuit has not adopted and indeed, in similar contexts, has already rejected. Even if Comey's imputed-animus theory were plausible, the facts that Comey marshals in support of his argument do not suggest such animus caused any fatal irregularity in the grand jury proceeding.

The merits defense presented in Comey's other "no true threat" motion to dismiss similarly casts no doubt on the regularity of the grand jury proceedings. Comey's argument

that the government has conflated true threats with incitement, and thus did not accurately instruct the grand jury, relies on a cramped conception of true threats that incorrectly omits the recklessness standard adopted by the Supreme Court in *Counterman v. Colorado*, 600 U.S. 66 (2023). Moreover, whether Comey's Instagram post constituted a true threat is a disputed issue, the exact the issue, to be resolved through litigation on the merits. The government was not required to anticipate and present all of Comey's potential defenses to the grand jury. Whether the grand jury considered Comey's First Amendment defense is irrelevant to whether an irregularity in the grand jury proceeding exists that would justify dismissal of the indictment.

Second, the circumstances surrounding Comey's indictment do not suggest any irregularity in the grand jury proceeding that would warrant dismissal, and thus those circumstances do not justify disclosure of grand jury materials. Comey primarily relies on alleged misrepresentations and omissions in two search warrant affidavits to suggest that those same misrepresentations and omissions characterize the evidence before the grand jury. While the government disputes that the warrant affidavits contain any material misrepresentation or omission as set forth in greater detail in its response to that motion, the merits of that dispute are irrelevant. A facially valid indictment is not subject to dismissal based on inadequate or incompetent evidence, much less purported irregularities in investigative methods and mechanisms used to develop said evidence.

That is true even as to the exculpatory evidence that Comey suggests the grand jury did not consider, because as black letter law has long established, the government has no obligation to present such evidence. And even if the warrant affidavits were constitutionally defective, which the Government denies, the exclusionary rule does not apply in grand jury proceedings and imposes no limit on the information the grand jury could consider before returning an indictment. In addition to alleged, disputed missteps in the warrant affidavits,

Comey cites a string of circumstances that he claims are each irregular in and of themselves. Again, the Government denies the accuracy of Defendant's contentions. But, regardless, none of those circumstances concern the grand jury proceeding. Thus, none could support any argument that Comey has presented a single particularized need, much less an amalgam of them, for disclosure of the grand jury materials.

Beyond these fatal flaws with Comey's core arguments, his motion suffers additional defects. For one, Comey heavily relies on a separate prosecution against him in the Eastern District of Virginia (EDVA) to argue that because errors allegedly existed in the grand jury proceeding in that case, there must be errors in this one. That red herring is easily dismissed, as this case involves different charges before a different grand jury presented by a different prosecutor from a different U.S. Attorney's Office. Moreover, Comey's motion makes a blanket request for all the grand jury materials in this case, a sweeping request not tailored even to his insufficient showing of particularized need. Finally, whatever minimal showing Comey has presented does not outweigh the traditional interests in grand jury secrecy.

## BACKGROUND

The United States incorporates by reference the Statements of Facts in its responses in opposition to Comey's Motion to Dismiss for Vindictive and Selective Prosecution, Motion to Dismiss for Lack of a True Threat, and Motion to Suppress and for a *Franks* Hearing, which are being filed contemporaneously with this brief. The United States briefly recites relevant facts here.[1]

On May 15, 2025, Comey was staying at a beachfront residence in Emerald Isle, North Carolina. Comey's novel "FDR Drive" was only five days from public release. As Publisher's

---

[1] Federal Rule of Criminal Procedure 6(e) limits the government's ability to describe what information was presented to the grand jury. The government's recounting of the underlying facts of this case is not an admission as to what was presented to the grand jury.

Weekly described the novel, and as posted on Comey's Instagram, the protagonist is a federal prosecutor "trying to take down Samuel Buchanan, a far-right media personality with a popular podcast." FDR Drive, *Publisher's Weekly*, https://perma.cc/6V82-HQ9A4. [*See* also Exhibit 1]. The prosecutor "believes Buchanan went far beyond the protection of the First Amendment when he singled out his enemies by name and suggested 'something should be done' about them. His fans have obliged, killing or grievously injuring some of his foes." *Id.* The novel itself describes the "stochastic terrorism" theory of Buchanan's offense at length:

> Sean nodded. "It's where a charismatic leader jacks people up but, through the wonder of the internet, avoids a direct connection to what comes next. *Stochastic* is a term from statistics that means you can estimate the likelihood of something happening, even if you can't predict who will do it and when and where."
>
> Jessica lifted her hand. "So it's like when King Henry II got Thomas Becket killed by simply saying, 'Will no one rid me of this meddlesome priest.?'"
>
> Benny laughed. Okay, now we're just makin' shit up. Kings? Priests? Stop. You guys have been drinking that Stolichnaya stuff."
>
> Sean smiled. "*Stochastic*, Benny. Definitely not vodka. And Jessica is spot on. But the fuller story of Henry II and Becket is closer to where I think we actually are. . . . I had to go look up the part I want to read you—what Henry *actually* said in front of his knights, after which they ran off and killed the Archbishop."
>
> Sean looked down at his notes. "Nobody was taping stuff on iPhones in 1170, but the most reliable version is that King Henry looked at his nights and actually said, 'What miserable drones and traitors have I nurtured and promoted in my household who let their lord be treated with such shameful contempt by a low-born clerk!' And the famous part was added about four hundred years later: Will none of these lazy insignificant persons, whom I maintain, deliver me from this turbulent priest?"
>
> Benny snorted. "So of course they go whack the guy. To the knights on his payroll, he's sayin' you're traitors and scumbags if you don't. That's about as close to an order as you can get. That's the way a Cosa Nostra boss would do it."
>
> "Agreed," Sean said, "and we don't have anything that good on Buchanan. We could prove to a jury that King Henry *knew* they were going to go after Becket.

He knew how the knights would react, given the way he spoke to them, which is damn good proof of his intent. But we actually can get pretty close to that here. I think we can prove—and no sheikh case pun intended here—that Buchanan is *willfully* blind to the individual attacks. He knows an attack will follow his words but he closes his eyes so he can say he wasn't part of it. Under the law, that willful blindness makes him as guilty as if he did the attack himself."

He turned back to the board and began drawing lines out from Buchanan's name, like the spokes of a wheel. "We can show five times he singled out someone, saying, in his word, 'They have to go' or 'They must be stopped.' Over and over again, he said that about a particular person—and within the overall context of 'Words aren't enough, people need to actually do something and take action.' And his listeners did exactly that—five times that we know of.

…

The room was quiet for a moment before Nora said, "But that's okay. I don't think we need to base his intent on the perfect-attack-record thing. I think we just argue that he *had* to know his words would result in the attacks. He may not have known the identity of his knights, but he knew they were out there and would act on his words. So he just shouted that they were—what were the king's words? 'Miserable drones and traitors'?—if they didn't get rid of the people he named. He knew what his knights would do. That should be enough to prove he intended it to happen.

"And don't forget, we have someone on the inside who saw it all happen, and she believes he knew what he was doing and wanted it to happen. What did Becky say the other day? Something about Buchanan talks like he's motivated by the cause, but he's really in it for the increased donations after each attack? It all fits."

She looked at Jessica and Benny, who were nodding.

"Fuckin' A," Benny mumbled.[2] [Exhibit 2].

Later in the book, a fictional expert witness researcher whose specialty is the online pathways through which individuals are drawn to ideologically motivated violence[3] testifies to a jury:

---

[2] Comey, FDR Drive 62–63 (Mysterious Press, May 20, 2025).
[3] *Id.* at 218.

> Those are people who are susceptible to messages that offer a sense of purpose through violence. …With a sad look, she explained that messages about violence always resonate more powerfully among young men. For a variety of reasons related to brain development and hormones, young men find violence more attractive as a source of meaning than women or older men do. The most effective radicalizing messages are those that tell consumers, especially young men, that they are special, that they are under siege, and that the noble course is to fight back against their enemies. It's a message that has worked for all human history, she explained. The Middle Ages had no social media, but recruiters still managed to convince thousands to leave their homes and fight a holy war in far-off Jerusalem. Of course, she added, the power of social media is that the recruiter doesn't need to ride on horseback to your medieval village; he's in your pocket reaching you constantly through your buzzing phone. It's an order of magnitude more effective, she said, and more dangerous.[4] [Exhibit 3].

On May 15, 2025, a charismatic leader named James Comey, through the wonder of the internet, posted a coded message to his followers meaning "kill" or "get rid of" (a euphemism for "kill") President Trump. Comey has acknowledged taking the picture of the seashells on May 15. [Exhibit 4].

To be sure, Comey's account suggests any similarity between his conduct and his novel are coincidental. But he has claimed that he and his wife were on a beach walk and happened upon seashells arranged in an "86 47" pattern. Of course, even if Comey did not arrange the seashells himself or plan his post in advance, that would not change the threatening nature of his post. But there is also reason to doubt his story. The shells were located four miles down the beach from the beachfront property where Comey was staying, in an area separated from the ocean by a sand dune. And there is no evidence that anyone else arranged, photographed, or even saw the shells.

In any event, at 3:12 pm, Comey's wife sent him a screenshot including what appeared to have been a cropped definition of "U.S. English slang" indicating that "86" means "to get

---

[4] *Id*. at 219–20.

rid of or refuse service." [Exhibit 5]. Two minutes later, at 3:14 pm, Comey posted a picture of the seashells on his Instagram account with the caption "Cool shell formation on my beach walk."

There is no serious dispute that an objective viewer of Comey's post could read it to mean "Kill President Trump." Comey has admitted that the "47" referred to President Trump. And Cassell's Dictionary of Slang (2nd edition) defines "86" to mean:

> to throw out, get rid of (1940's), (1970) to kill, to murder to execute judicially, (1980) to be finished ready to leave or out of an item or be exhausted.[5] [Exhibit 6].

The Wikipedia entry available to anyone who googled it on May 15, 2025 (last updated prior to May 15, 2025, on April 27, 2025), includes this excerpt: "According to Cassell's Dictionary of Slang, "to 86" also means "to kill, to murder; to execute judicially," likely referring to the size of a standard grave being 2.5 feet wide by 8 feet long and 6 feet deep. Other slang dictionaries confirm this definition."[6] It appears that the Wikipedia page for "86"

---

[5] At least one court has relied on Cassell's Dictionary of Slang. *United States v. Parker*, No.: 8:09-CR-0162, N.D.N.Y., August 7, 2009, *12, n.10 (2009 WL 2473510). Cassell's Dictionary of Slang has also been cited in multiple law journal articles, including: Yale Journal of Law & the Humanities, The Woman Will Be Out: A New Look at the Law in Hamlet, 20 YJLH 31, 59 at n.149 (Spivack, 2008); Houston Law Review, "Election" of Remedies: The City of Houston, the Sister Courts, and the Mission to Interpret the Tort Claims Act, 50 Hous. L. Rev. 1507, 1532 at n32 (Wischnewsky, 2013); Mississippi College Law Review, Four for the Fifth: The First Mississippi Judges on the Fifth Circuit, 34 Miss. C. L. Rev. 233, 243 at n.31 (Southwick, 2015); Yale Journal of Health Policy, Law & Ethics, Decentralizing STD Surveillance: Toward Better Informed Sexual Consent, 12 Yale J. Health Pol'y, L. & Ethics 1, 4 at n.19 (Fan, 2012); New York University Review of Law and Social Change, A 'Ho New World: Raced and Gendered Insult as Ersatz Carnival and the Corruption of Freedom of Expression Norms, 33 N.Y.U. Rev. L. & Soc. Change 43, 49 at n.22 (Inniss, 2009); Loyola of Los Angeles Law Review, Super Size me and the Conundrum of Race/Ethnicity, Gender, and Class for the Contemporary Law-Genre Documentary Filmmaker, 40 Loy. L.A. L. Rev. 687, 708 at n.84 (Austin, 2007), and; UIC John Marshall Law Review, "What I Said was 'Here is where I can Cash in'" the Instrumental Role of Congressman Hatton Sumners in the Resolution of the 1937 Court-Packing Crisis, 54 IUC J. Marshall L. Rev. 379, 427 at n.282 (Daniel, 2021).

[6] *86 (term)*, Wikipedia, https://en.wikipedia.org/w/index.php?title=86_(term)&oldid=12-87585915 (April 27, 2025 entry).

has been modified hundreds of times since May 15, 2025, including over 100 times on May 16, 2025, alone.[7] [Exhibit 7].

Similarly, on May 15, 2025, Merriam Webster.com had an article available titled "What does 'eighty-six' mean?" that included the following statement: "Among the most recent senses adopted is a logical extension of the previous ones, with the meaning of "to kill." We do not enter this sense, due to its relative recency and sparseness of use."[8]

Past news stories have also used the phrase "86" to describe killing.[9] And a former mob boss has informed the FBI that in his world, "everyone knew" that 86 meant "kill," and given Comey's experience as FBI Director, there is "no way that Comey did not know that." In any event, as noted above, in Comey's own novel "Nora" expressly uses the euphemism "get rid of" (and the novel generally uses other similar phrases) as equivalent to "kill."

Within a few hours when Comey's post appeared, there was immediate public outcry. In Emerald Isle, at least two residents, one employed by the Police Department, notified the Emerald Isle Chief of Police. At least one relative of Comey also understood the post's apparent meaning. The relative texted Comey's wife: "You guys have really gone off the deep end over the years with your TDS [Trump Derangement Syndrome]. 8647 is a call for violence no matter how you spin it. You should be ashamed of yourselves. . . . I hope Jim goes to jail for his crimes." Comey's wife responded denying that the post had been a call to violence. [Exhibit 8].

---

[7] *Id.*

[8] Eighty-six, Merriam-Webster, https://www.merriam-webster.com/dictionary/86 (last visited Aug. 18, 2026).

[9] John Kifner, W*AR IN THE GULF: War Notebook; This Time, 'Good to Go' Is American Battle Cry*, N.Y. Times (Feb. 3, 1991), https://www.nytimes.com/1991/02/03/world/war-in-the-gulf-war-notebook-this-time-good-to-go-is-american-battle-cry.html.

Comey deleted the post later that day. He has claimed he did so in response to the text from his relative. Comey also put up a new post stating:

> I posted earlier a picture of some shells I saw today on a beach walk, which I assumed were a political message. I didn't realize some folks associate those numbers with violence. It never occurred to me but I oppose violence of any kind so I took the post down.

While he initially refused to provide his address at the beach house to be interviewed on the night of May 15, Comey later told the Secret Service (which, along with the FBI, investigated the potential threat) that Comey had interpreted "86" as a term meaning to "ditch, dump, or replace" and "47" as representing President Trump. Despite Comey's experience in federal government, he did not explain how a second term President with a nearly evenly divided Congress could realistically be ditched, dumped, or replaced—that is, gotten rid of—through ordinary political means.

As the post continued to generate controversy, Comey sent a text message stating: "This is provoking me to be more vocal, which I will start next week in NYC (including a return to Colbert)." [Exhibit 9]. The next day, Comey's publishing agent texted him: "Hey 5-16 Jim, I'm sure you're dealing with a lot of BS right now. I have a message from ABC which I'll forward to you. Let me know if I can be of assistance." Comey responded: "Thanks, it is truly crazy. But I'm not speaking to any media." A few minutes later, his publishing agent wrote: "Also on the bright side you've gone viral. " Comey quickly replied: "Not my intention, but I'll be OK if it sells books." The publishing agent responded: "Music to an agent's ears." [Exhibit 10] In his interview to promote his new book with the Wall Street Journal published on May 23, 2025, Ellen Gamerman asked him: "Is there a universe where you did this to promote your book?" to which Comey responded: "Not in a universe I live in."[10]

---

[10] Ellen Gamerman, *James Comey on His New Thriller, Those Seashells and That Signal Chat*, The Wall Street Journal (May 23, 2025), https://www.wsj.com/arts-

On May 20, 2025, Comey appeared as a guest on the Late Show with Stephen Colbert to discuss his book release:

> Colbert: "You stirred up a little controversy recently. I was gonna say you landed in hot water, but it's just water. Because I don't know if you did this on purpose just to get attention here, but your Instagram this you were walking on the beach. What happened? You were walking on the beach, you saw this on the beach?"
>
> COMEY: "Yeah, my wife and I, Patrice, were walking on the beach and saw those numbers in shells on the beach."
>
> Colbert: "You didn't do this? Somebody else did this?"
>
> COMEY: "Yeah, somebody else did it. We were on a walk preparing for this week, the rollout of my book. She looked at it and said, "Why did someone put their address in the sand?" And we stood at it, trying to, looked at it trying to figure out what it was. And she had long been a server in restaurants and she said, "You know what, I think it is a reference to restaurants when you "86" something in a restaurant." And I said, "I would…"
>
> Colbert: "Right, its off the menu."
>
> COMEY: "yeah, nah I remember when I was a kid, you'd say "86" to get out of a place. This place stinks, let's "86" it."
>
> Colbert: "I was a bartender, you would "86" a customer if they were getting drunk. Like, let's "86" him, give him a low proof alcohol or something like that."
>
> COMEY: "And so I said, "I think it's a clever political message." And she said, "You should take a picture of it." I said, "sure." And then she said, "You should Instagram that." And BOOM." (Exhibit 11)

Later in the interview, Colbert said: "OK, well congratulations on the attention for your book. There you go. That is a hell of a viral campaign."[11] *Id.*

---

culture/books/james-comey-seashells-trump-8647-book-fdr-drive-93dee8ed?msockid=03e31da23b0b6c242fc20a0c3ab66d68.

[11] https://www.youtube.com/watch?v=KRs-KSczhOA.

A grand jury returned an indictment against Comey charging him with violating 18 U.S.C. §§ 871(a), 875(c) for knowingly and willfully threatening to take the life of the President and transmitting that communication in interstate commerce.[12]

## ARGUMENT

### I. A Strong Presumption of Regularity Imposes a Heavy Burden on Comey to Show a Particularized Need to Pierce Grand Jury Secrecy.

The grand jury "is a constitutional fixture in its own right," not "textually assigned" in the Constitution to any branch of government. *United States v. Williams*, 504 U.S. 36, 47 (1992).[13] It "stands apart from other functions of government," *United States v. Jefferson*, 546 F.3d 300, 312 (4th Cir. 2008), "occup[ying] a high place as an instrument of justice in our system of criminal law," *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983). Because "the whole theory of [the grand jury's] function is that it belongs to no branch of the institutional Government," it operates "at arm's length" from the judicial branch, such that "[j]udges' direct involvement in the functioning of the grand jury has generally been confined to the constitutive one of calling the grand jurors together and administering their oaths of office." *Williams*, 504 U.S. at 47. Courts do "not intervene in the grand jury process absent a compelling reason." *United States v. Moss*, 756 F.2d 329, 331 (4th Cir. 1985).

In carrying out its duties, the grand jury serves the "dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." *Branzburg v. Hayes*, 408 U.S. 665, 686-87 (1972). To protect those functions, "long-established policy … maintains the secrecy of the grand jury

[12] Federal Rule of Criminal Procedure 6(e) limits the government's ability to describe what information was presented to the grand jury. The government's recounting of some of the underlying facts of this case is not an admission as to what was presented to the grand jury.
[13] Unless otherwise noted, all internal quotation marks, internal citations, emphasis, and alterations are omitted.

proceedings in the federal courts." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 (1958); *see Sells Eng'g*, 463 U.S. at 424 (explaining "the grand jury's dual function underlies" this policy). Indeed, "the proper functioning of [the] grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). So strong is the grand jury secrecy norm that it is "indispensable" to the proceedings and "must not be broken except where there is a compelling necessity." *Proctor & Gamble*, 356 U.S. at 682.

Federal Rule of Criminal Procedure 6(e) "codifies the traditional rule of grand jury secrecy." *Sells Eng'g*, 463 U.S. at 425; *see United States v. Penrod*, 609 F.2d 1092, 1096 (4th Cir. 1979) (similar). Under that rule, certain enumerated persons "must not disclose a matter occurring before the grand jury," "unless these rules provide otherwise." Fed. R. Crim. P. 6(e)(2)(B). The list encompasses nearly everyone involved in grand jury proceedings, except witnesses. *See id.*

Rule 6(e)(3) lists the exceptions to grand jury secrecy. Comey cites only one: that a court may authorize disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Piercing grand jury secrecy in favor of any exception, including Rule 6(e)(3)(E)(ii), is (and should be) a rarity. *See Douglas Oil*, 441 U.S. at 220 ("[C]ourts have been reluctant to lift unnecessarily the veil of secrecy from the grand jury."); 1 Wright & Miller, *Fed. Prac. & Proc.* § 109 (5th ed. Apr. 2026 Update) ("[G]iven the various difficulties of making the showing, it is not surprising that a large number of motions filed under subsection 6(e)(3)(E)(ii) are denied.").

As Comey admits, grand jury proceedings are "[entitled to] a presumption of regularity." [DE 38 at 1]; *see, e.g.*, *R. Enters., Inc.*, 498 U.S. 292, 300-01 (1991); *Hamling v.*

*United States*, 418 U.S. 87, 139 n.23 (1974); *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 251 (4th Cir. 2023); *United States v. Alvarado*, 840 F.3d 184, 193 (4th Cir. 2016). To overcome that presumption when seeking disclosure under Rule 6(e)(3)(E)(ii), a defendant "bears the heavy burden of establishing that 'particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment.'" *United States v. Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004); *see United States v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007); *see also United States v. Wallace*, 528 F.2d 863, 865 (4th Cir. 1976). The burden cannot be satisfied"[with] conclusory or speculative allegations of misconduct," *id.*, but only through a "strong showing of particularized need." *Sells Eng'g*, 463 U.S. at 443. Disclosure of matters occurring before the grand jury should "be denied in all but extraordinary circumstances." *United States v. Harris*, 2007 WL 1724298, at *5 (N.D.W. Va. June 14, 2007).

This demanding standard protects grand jury secrecy by preventing defendants from using Rule 6(e)(3)(E)(ii) "to engage in a fishing expedition to see if any evidence exists to support a potential motion to dismiss the indictment." *Nguyen*, 314 F. Supp. 2d at 617; *see United States v. Wemmering*, No. 5:04-CR-347-3F3, 2005 WL 8162295, at *6 (E.D.N.C. Nov. 4, 2005) (adopting this reasoning). A defendant's mere "desire to investigate whether any grand jury impropriety has occurred is insufficient to rebut the strong presumption of regularity in grand jury proceedings." *Nguyen*, 314 F. Supp. 2d at 617. Indeed, piercing grand jury secrecy to accommodate such a desire "would eviscerate the shield of secrecy," with "the result … that every defendant would seek [disclosure] in the hope of discovering some ground to seek dismissal of the indictment." *Id.* Thus, as Comey concedes, courts must "exercise caution" when deciding whether to disclose matters occurring before the grand jury. [DE 38 at 7].

## II. Comey Has Not Overcome the Presumption of Regularity.

Comey has not met his burden to overcome the presumption of regularity to justify disclosure of the grand jury materials in this case. His two main thrusts purport that (1) his separate motions to dismiss "support a reasonable inference of irregularities before the grand jury" and (2) "the circumstances surrounding the return of the indictment in this case indicate that the government may have misstated key factual and legal issues to the grand jury." DE 38 at 1. Neither argument presents the strong showing of particularized need that outweighs traditional interests in maintaining grand jury secrecy.

### A. Comey's separate motions to dismiss provide no reason to cast aside grand jury secrecy in this case.

Comey argues that issues raised in his motions to dismiss show "a strong possibility that there were irregularities in the grand jury proceedings that would provide a basis for dismissal of the indictment." [DE 38 at 10]. Comey is incorrect. Neither his vindictive and selective prosecution arguments nor his First Amendment (or "True Threat") defense that his Instagram post did not constitute a true threat provide sufficient basis to disclose the grand jury materials.

#### 1. Comey's vindictive and selective prosecution arguments do not justify disclosure of grand jury materials.

Without regard to the merits of his motion to dismiss for vindictive and selective prosecution (which is meritless), they can never justify disclosure of grand jury materials under Rule 6(e)(3)(E)(ii). *See* [DE 38 at 10-11]. Rather, Comey's attempt to bootstrap his vindictive and selective prosecution arguments into issues that existed at the grand jury is speculative, at best, reflecting nothing more than a mere "desire to investigate whether any grand jury impropriety has occurred," which is "insufficient" to warrant disclosure. *Nguyen*, 314 F. Supp. 2d at 617. Allowing this argument to unlock Pandora's Box permitting defendants to peek behind the curtain will allow every defendant to make similar claims.

For starters, Comey's argument is an ill fit with Rule 6(e)(3)(E)(ii). That rule targets reasons to dismiss an indictment "because of a matter that occurred before the grand jury"—i.e., "irregularities in the grand jury proceedings" themselves that merit dismissal. *Nguyen*, 314 F. Supp. 2d at 616. In contrast, the vindictive and selective prosecution doctrines concern a prosecutor's exercise of discretion to indict in the first place before the Grand Jury is ever involved. Generally, if "the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). As such, a "presumption of regularity supports [his] prosecutorial decisions." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Arguing vindictive or selective prosecution tries to "overcome th[at] presumption of prosecutorial regularity." *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001). Such arguments are thus not an attack on the regularity of the grand jury proceedings themselves, so they fall outside of the circumstances contemplated by Rule 6(e)(3)(E)(ii).

Comey's own argument highlights the disconnect. He contends that "[d]isclosure of the grand jury materials … is reasonably calculated to provide additional support for that argument"—namely, that Comey "would not have been prosecuted but for President Trump's animus." [DE 28 at 12]. He thus seeks disclosure *not* to uncover irregularities in the grand jury proceedings—as required under Rule 6(e)(3)(E)(ii)—but to try to unearth additional evidence to support his arguments that the original, separate decision to indict him, which was a precursor to presenting the indictment to the grand jury, was vindictive and selective. The rule does not contemplate such "fishing expeditions." [DE 38 at 8]; *see Nguyen*, 314 F. Supp. 2d at 617. And Comey cites no case in which a successful vindictive or selective prosecution argument (which the government denies in this case) formed the basis to disclose the later created grand jury materials under Rule 6(e)(3)(E)(ii). *See* [DE 38 at 11-12].

Next, Comey zeroes-in on his vindictive-prosecution argument, contending that review of the grand jury proceedings is necessary "to assess whether the same animus that drove the charging decision infected the grand jury presentation." [DE 38 at 11]; *see United States v. Villa*, 70 F.4th 704, 710 (4th Cir. 2023) (explaining an element of prosecutorial vindictiveness is whether "the prosecutor acted with genuine animus toward the defendant"). Relying solely on a theory of imputed animus, Comey argues that because President Trump allegedly has constitutional actionable animus toward him, U.S. Attorney Boyle and line prosecutors who presented the case to the grand jury should be attributed that same purported animus. [DE 38 at 11]. But Comey cites no case in which the Fourth Circuit has allowed the animus of others to be imputed to the prosecutor.

To the contrary, the Fourth Circuit has repeatedly held that it "will not impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution." *United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997); *see United States v. Cooper*, 617 Fed. App'x 249, 251 (4th Cir. 2015) (same); *United States v. Lucas*, 62 Fed. App'x 53, 56 (4th Cir. 2003) (same); *see also Wilson*, 262 F.3d at 320 (declining to impute the animus of the U.S. Attorney in one district to the U.S. Attorney in a different district who authorized the indictment).[14] If cases where agents who are close to the investigation and perhaps are even part of the prosecution team have animus that is not imputed to the prosecutor, then neither should the purported animus of an official several steps removed.

[14] Comey cites *United States v. Monsoor*, in which the Seventh Circuit reasoned that to impute the "animus of a referring agency to a federal prosecutor, a defendant must establish that the agency in some way prevailed upon the prosecutor in making the decision to seek an indictment." 77 F.3d 1031, 1035 (7th Cir. 1996). In *Hastings*, the Fourth Circuit cited *Monsoor*, but only for the opposite proposition that "the animus of a referring agency is not, without more, imputed to federal prosecutors." 126 F.3d at 314.

Even if such imputation were allowed, it would make no difference in whether Comey has shown independent, particularized, and factually-based grounds to believe that irregularities in the grand jury proceedings would compel dismissal of the indictment. This portion of Comey's motion focuses on two prosecutors. One stated that "he had opened this case because he was 'ordered to.'" [DE 38 at 11-12]. While the Government denies Defendant's version of what this meant, that attorney did not present the case to the grand jury. So, his statements are irrelevant to assessing the regularity of the grand jury proceedings made almost a year later, several months after he had left the office—he has no knowledge of what happened at the grand jury. *Compare* [DE 43-1] 5, *with* [DE 1] 3.

The second prosecutor, who did present the indictment, was "a junior attorney new to [the] case." [DE 38 at 12]. In interactions with defense counsel, this line prosecutor "was at all times professional." [DE 38 at 5 n.2.] Comey admits he was duly serving AUSA and makes no showing that this prosecutor had any animus that affected the quality of his grand jury presentation. And Comey makes no showing that this prosecutor was pressured by the "public [] attack[s]" on Comey and "call[s] for … prosecution" by President Trump. [DE 38 at 11]. Comey's attempt to pair the entry of the new prosecutor into the case with "[then-]Acting Attorney General Blanche's public signaling," [DE 38 at 12], is a sleight of hand that fails to draw any meaningful connection between such alleged public signaling and the prosecutor's judgment in assessing whether "probable cause [existed] to believe that the accused committed an offense defined by statute," *Bordenkircher*, 434 U.S. at 364. He certainly has offered no support to suggest the prosecutor was influenced by Attorney General Todd Blanche or anyone in main Justice when presenting the evidence supporting such probable cause to the grand jury.

Finally, Comey argues that the prosecutor who presented the indictment "was destined to repeat" to the grand jury alleged misrepresentations in "warrant affidavits

reviewed by senior levels of the U.S. Attorney's Office shortly before and after the indictment." [DE 38 at 12]. But this argument says nothing about why Comey's prosecution is vindictive or selective, much less why his vindictive and selective prosecution arguments provide a basis to pierce grand jury secrecy.

Moreover, the argument fails because it implicitly assumes that the alleged misrepresentations, which the Government denies, must have caused the grand jury to return a true bill based on improper evidence. But Comey does not challenge the facial validity of the indictment,[15] and "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra*, 414 U.S. 338, 345 (1974). Comey also does not argue that the prosecutor knowingly elicited false testimony. *See* [DE 38 at 12]. This lack of knowledge of any actual problem cannot provide an argument to break the sacred walls of the Grand Jury.

In *Bank of Nova Scotia v. United States*, which Comey cites repeatedly, the Supreme Court rejected a challenge to an indictment's validity based on "misleading and inaccurate summaries" presented by IRS agents to the grand jury in the absence of evidence "that the prosecutors knew the evidence to be false or misleading, or that the Government caused the agents to testify falsely." 487 U.S. 250, 260-61 (1988); *see United States v. Strouse*, 286 F.3d 767, 772 (5th Cir. 2002) (holding that "perjury before the grand jury that was not knowingly sponsored by the government may not form the basis for a district court's dismissal of an indictment"); *Wemmering*, 2005 WL 8162295, at *6 (rejecting request for grand jury materials

[15] A facially valid indictment is one that tracks the statutory language, properly alleges each element of the charge, and sufficiently informs the defendant of what he needs to show for a defense and to bring any potential double jeopardy challenge later. *See United States v. Wills*, 346 F.3d 476, 488-89 (4th Cir. 2003); *United States v. Cobb*, 905 F.2d 784, 790 (4th Cir. 1990); *United States v. Woodruff*, 783 F. Supp. 3d 870, 875 (E.D.N.C. 2025). The issues that Comey raises in this and his other motions do not implicate the indictment's facial validity.

in part because the defendant "ha[d] not forecasted" a showing that "the Government knowingly present[ed] perjured testimony"); *see also infra*, Part II.B.1 (addressing alleged misrepresentations in greater detail). The same reasoning applies here. Comey can point to no information suggesting any actual irregularity.

**2. Comey's "no true threat" merits defense casts no doubt on the regularity of the grand jury proceedings.**

Comey argues that "legal defects in the indictment create an independent risk that the grand jury was wrongly instructed on the law it was asked to apply." [DE 38 at 12-13]. The purported "defects," according to Comey, are (1) that his Instagram post was constitutionally protected speech, not a true threat, and (2) that the government conflated "the true-threat standard" with an "incitement theory" when instructing the grand jury. [DE 38 at 13-14]; *see* [DE 38 at 17-18] (rehashing the same argument). These arguments miss the mark several times over.

To start, whether Comey's Instagram post is protected by the First Amendment is a merits defense at trial or perhaps the topic of a motion to dismiss which he is pursuing separately. Regardless, it is never a "legal defect[]" in the indictment that implicates the underlying grand jury proceedings. As *United States v. Stevens* (a case cited by Comey) makes clear, the government "is not required … to anticipate and present all of a defendant's affirmative defenses to the grand jury." 771 F. Supp. 2d 556, 566-67 (D. Md. 2011). Thus, whether the government presented the grand jury with Comey's potential First Amendment defense, or not, says nothing about whether its proceedings were tainted by irregularities.

Moreover, Comey is simply incorrect that his Instagram post could not constitute a true threat. A true threat is an "unprotected category of communications." *Counterman*, 600 U.S. at 74. Deciding whether a particular communication constitutes a true threat requires assessing objective and subjective components–context. Objectively, a true threat is "one that

a reasonable recipient familiar with the context would interpret as a serious expression of an intent to do harm." *United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016).[16] Subjectively, the defendant must have a culpable mental state—and recklessness suffices.

The government need only prove "that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69; *see White*, 810 F.3d at 221. As evidenced by its return of a true bill, the grand jury found probable cause as to all elements of both charges. Although Comey disagrees with that determination, his argument purporting to recite the applicable law omits the recklessness standard. *See* [DE 38 at 13]. And in any event, his disagreement is one to be resolved on the merits by the petit jury, not in ancillary motions practice over the grand jury proceedings. *See Calandra*, 414 U.S. at 345 ("[A]n indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."); *Costello v. United States*, 350 U.S. 359, 362-63 (1956); *Jefferson*, 546 F.3d at 312.

Relatedly, Comey shows nothing to suggest that the prosecutors incorrectly instructed the grand jury on the law. Comey tries to manufacture such risk by claiming the government has confused the true-threat and incitement doctrines. [DE 38 at 13]. Yet he does not specifically identify where the government has relied on an incitement theory. At most,

[16] Comey cites an earlier Fourth Circuit decision of a similar name, *United States v. White*, 670 F.3d 498, 513 (4th Cir. 2012). [DE 38 at 13]. But the court recognized in its more recent 2016 *White* decision that *Elonis v. United States*, 575 U.S. 723 (2015), abrogated the old 2012 *White* decision's holding that "liability under § 875(c) can turn solely on how a recipient would interpret a statement, without regard to whether the speaker intended it as a threat." *White*, 810 F.3d at 220. Comey does not acknowledge the abrogation or address how it affects his arguments. Comey cites the 2012 decision for the proposition that "the Fourth Circuit has made clear that a true threat requires the speaker to threaten violence herself." [DE 38 at 13]. Yet that proposition is flatly contrary to the 2016 *White* decision's (and later *Counterman*'s) recognition that recklessness is a sufficient *mens rea* to sustain a conviction

Comey suggests that the government may have "conflated … threat and incitement … in every one of its search warrant applications." [DE 38 at 13]. Instead, Comey conflates these legal standards. His articulation of the true-threat standard fails to incorporate *Counterman*'s holding that a *mens rea* of recklessness suffices for criminal liability, and as a result, Comey conflates recklessness under the true-threat standard with incitement. They are, however, "distinct standard[s]." *Counterman*, 600 U.S. at 82.

Comey's reliance on public statements by certain officials and President Trump's son also provides no reason to conclude that prosecutors incorrectly instructed the grand jury. [DE 38 at 13-14]; *see* [DE 38 at 18]. Unaffiliated individuals' contemporaneous public characterizations of Comey's Instagram post as a call to violence has nothing to do with the grand jury proceedings in this case. Comey makes no showing that these individuals interacted in any way with the grand jury proceedings, much less that they have any knowledge of the grand jury's secret proceedings.

**B. Comey identifies no alleged misrepresentation that justifies disclosure of grand jury materials.**

Comey next argues that disclosure of grand jury materials is warranted because the prosecutor who presented this case "seriously misstated the applicable law and facts" in a manner that "would provide any additional basis for dismissal of the indictment." [DE 38 at 14]. This argument is highly speculative, and it is largely underpinned by claims about the grand jury proceeding that could not form a proper basis for dismissal.

**1. The Apple and Google search warrant affidavits do not disclose any actionable irregularity in the grand jury proceedings.**

Comey asserts that "[t]he government's warrant affidavits are the most reliable proxy for what was likely presented to the grand jury," and thus alleged misrepresentations and

omissions in those affidavits somehow reflect irregularities in the grand jury proceedings.[17] [DE 38 at 14-17]. Specifically, Comey cites alleged omissions "disproving the government's theory that Mr. Comey must have known that '86' can mean 'kill' based on his experience prosecuting organized crime," [DE 38 at 15]; allegedly "slanted retellings of Person-1's statements to government investigators" and alleged omissions "concealing [his] underlying reliability," [DE 38 at 15-16]; and alleged implications that "Mr. Comey's attorney Mr. Kelley obstructed the investigation" and "insinuation about Ms. Comey's Google searches," [DE 38 at 16-17]. The United States rebuts these assertions in its brief in opposition to Comey's Motion to Suppress and for a *Franks* Hearing. Nevertheless, resolving these disputes regarding accusations from warrant affidavits has no relevance to assessing the regularity of the grand jury proceedings.

*First*, by asking the Court to view the warrant affidavits as a proxy for the evidence presented to the grand jury, Comey effectively urges the Court to examine the evidence before the grand jury as a means of reviewing the regularity of the proceedings. That position enjoys no support in the law. Indeed, it inverts the process seeking to peek behind the veil to justify peeking at the secret information.

As explained, a facially valid indictment "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *Calandra*, 414 U.S. at 345; *see Costello*, 350 U.S. at 362-63; *Jefferson*, 546 F.3d at 312. Indeed, the grand jury may consider a broad range of evidence, even "tips" and "rumors." *Calandra*, 414 U.S. at 344; *see In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 196 (4th Cir. 2010) ("Virtually

---

[17] Comey cites no authority for the proposition that warrant affidavits are predictive of what testimony was presented to the grand jury. The Court need not resolve that question, however, because any alleged defects in the affidavits do not show particularized and factually based grounds for ordering disclosure of the grand jury materials.

any source that may be helpful to the investigation can be considered."). Because "[t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered." *Id.* at 344-45. While the government denies this speculation concerning the evidence presented to this grand jury, even if the evidence a grand jury considers is "unreliable," that alone "is not sufficient to require a dismissal of the indictment." *Bank of Nova Scotia*, 487 U.S. at 261; *see Costello*, 350 U.S. at 363 (upholding indictment when the only evidence presented to the grand jury was hearsay).

*Second*, Comey's arguments imply that the government concealed exculpatory information from the grand jury, and that doing so somehow taints the proceedings. Without admitting, denying, or in any other way characterizing the information presented to the Grand Jury, Supreme Court precedent has long stated that a prosecutor is under no duty to present exculpatory evidence to the grand jury. *See Williams*, 504 U.S. at 52 ("Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the grand jury] system."); *United States v. Witasick*, 443 Fed. App'x 838, 843 (4th Cir. 2011) (rejecting claim that prosecutor engaged in misconduct because he "was required to present exculpatory evidence to the grand jury and did not do so"); *United States v. Williams*, 70 Fed. App'x 141 (4th Cir. 2003) (similar). As such, "a district court may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury substantial exculpatory evidence in its possession." *United States v. Neely*, 966 F.2d 1445 (Table), 1992 WL 122291, at *1 (4th Cir. 1992). Whether exculpatory information was presented to the grand jury can never be grounds for disclosure of grand jury materials under Rule 6(e)(3)(E)(ii).

*Third*, to the extent that Comey tries to attack the Apple and Google warrants' validity to suggest that the grand jury heard evidence obtained in violation of the Fourth Amendment,

that argument is similarly unavailing. "[A] facially valid indictment is not subject to dismissal simply because the grand jury may have considered … evidence that may contravene a constitutional privilege." *Jefferson*, 546 F.3d at 312. That principle holds true even for information obtained in violation of the Fourth Amendment (which the United States denies occurred here), because the exclusionary rule does not apply to grand jury proceedings, imposing no limit on the information the grand jury may consider. *See Calandra*, 414 U.S. at 348-55; *see In re Grand Jury Subpoena (T-112)*, 597 F.3d at 197 (holding grand jury could consider subpoenaed documents even if they were the fruit of unconstitutional surveillance).

*Fourth*, even if it mattered for this motion (it does not), Comey is incorrect that the warrant affidavits were infected by material misrepresentations and omissions.

**2. The procedures used in this case demonstrate no need for review of the grand jury materials.**

Comey argues that "[t]he procedures that generated this indictment are themselves a basis for inferring that the grand jury presentation was irregular." [DE 38 at 18]. They are not. The AUSA who "was 'ordered to' open" the case, which does not implicate the pejorative connotation Comey conjures, did not present the case to the grand jury. [DE 38 at 18]. That the Secret Service engaged in a preliminary investigation to address immediate safety issues for the constantly targeted President without recommending charges before the FBI took over the investigation says nothing about whether the FBI's thorough investigation uncovered evidence supporting probable cause for indictment. [DE 38 at 18-19]. Purported "signal[ing]" by Attorney General Blanche is not probative of how the case was presented to the grand jury. [DE 38 at 19]. That a purported "junior prosecutor" presented the case to the grand jury does not and cannot raise an inference that the prosecutor by virtue of his experience must have introduced an irregularity into the proceeding. [DE 38 at 19].

Moreover, whether the government "reviewed materials potentially containing privileged communications" in its investigation says nothing about whether those materials were presented to the grand jury. [DE 38 at 19]. As documents that Comey filed on the docket show, the government was forthcoming with Comey's counsel about who had reviewed information obtained in its investigation and informed counsel that "[t]he communications or their contents were not presented to or discussed with the Grand Jury." [DE 43-41] 3. Indeed, they could not have been presented since "[t]he Indictment was approved and obtained before the agents or prosecutors had access to the communications or their contents." *Id.* Comey's insinuation that any reliance on these communications somehow tainted the grand jury proceedings that occurred before anyone on the prosecutorial team saw the communications is thus belied by the record and can provide no basis for inferring grounds to disclose grand jury materials under Rule 6(e)(3)(E)(ii). *See United States v. Colasurdo*, 453 F.2d 585, 595-96 (2d Cir. 1971) (holding "whether the grand jury had before it evidence obtained in violation of the attorney-client privilege … would not be grounds for dismissing the indictment"); *United States v. Rodolitz*, 648 F. Supp. 430, 432 (S.D.N.Y. 1986) (denying "dismissal of the indictment based on an alleged violation of … the attorney-client privilege before the grand jury").

**C. The circumstances surrounding Comey's indictment in the Eastern District of Virginia have no bearing on this case.**

Comey leans heavily on his version of circumstances surrounding his indictment in the Eastern District of Virginia to try to suggest that because alleged misconduct occurred before the grand jury in that case, the same must be true of the grand jury proceedings in this case. [DE 38 at 2-4, 10-11, 19]. That argument is a non sequitur, and the Court should give it no weight. The case in the Eastern District of Virginia involved different charges based on entirely independent and dissimilar facts and was brought before a different grand

jury by a different prosecutor in a different U.S. Attorney's Office. What happened before the grand jury in that case is not probative or predictive of the proceedings in this case. It is speculation to assume otherwise. *Cf. Wilson*, 262 F.3d at 320 (declining to impute the animus of the U.S. Attorney in one district to the U.S. Attorney in another district); *United States v. Smith*, 398 Fed. App'x 938, 941 (4th Cir. 2010) (explaining, in the *Brady* context, that a prosecution team in one district is not imputed with the knowledge of the prosecution team in another district).[18] The circumstances surrounding the Eastern District of Virginia case simply do not create the required particularized factually-based grounds to even suggest, much less affirmatively carry the heavy burden of showing, that irregularities exist in the grand jury proceedings in this case that would warrant further review or exposure, much less dismissal of the indictment.

### D. The need for grand jury secrecy plainly outweighs Comey's insufficient showing of particularized need.

Beyond making a "strong showing of particularized need" for disclosure of grand jury materials, Comey must show that his particularized need "outweighs the public interest in secrecy." *Sells Eng'g*, 463 U.S. at 442-43; *see In re Grand Jury Proceedings*, 800 F.2d at 1298. For the reasons stated above, Comey has not made the required showing of particularized need. The public interest in maintaining grand jury secrecy plainly outweighs his insufficient showing of purported need for disclosure. In considering the public interest, the Court "consider[s] not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries." *Douglas Oil*, 441 U.S. at 222.

---

[18] Although the investigation in this case was originally opened by a prosecutor who also worked on the Eastern District of Virginia case, that prosecutor did not participate in the grand jury proceedings in either case and left this office months before the grand jury indicted Comey.

First, maintaining grand jury secrecy in this case protects future grand juries' ability to hear voluntary testimony. As the Supreme Court has explained, "if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony." *Id.* at 219. That concern applies in all cases but is heightened in high-profile cases like this one. If courts routinely disclosed grand jury materials in every high-profile case even where, as here, no strong particularized need for disclosure exists, potential witnesses' perception of whether a case will garner publicity could disincentivize them from voluntarily offering testimony to the grand jury.

Second, grand jury secrecy promotes truthful testimony by witnesses. Indeed, without grand jury secrecy, "witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements." *Id.* Without a strong showing of need for disclosure, no reason exists to undermine the secrecy norm that promotes candor before the grand jury.

Third, reasons particular to this case justify the continued secrecy of the grand jury proceedings. This case has not yet gone to trial, meaning that any witness who testified before the grand jury has not yet testified publicly about the same matters. *Cf. Dennis v. United States*, 384 U.S. 855, 872 (1966) (reversing denial of disclosure where the grand jury testimony was given years earlier and the same witnesses had testified publicly); *see also Douglas Oil*, 441 U.S. at 221 (describing *Dennis*). Moreover, the statute of limitations has not yet expired. *See* 18 U.S.C. § 3282. Should the grand jury's investigation for some reason continue, premature disclosure of grand jury materials could impact those proceedings. *See (cf) United States v. Comey*, 809 F. Supp. 3d 396, 414 (E.D. Va. 2025) (weighing interests in

favor of disclosure in part because "the statute of limitations has expired so there is no danger that release of grand jury materials could impact future grand jury proceedings")

Finally, should disclosure of grand jury materials for some other reason be appropriate as trial approaches, *see, e.g.*, Fed. R. Crim. P. 26.2(f)(3), the government will make such disclosure in due course as it routinely does. Comey's defense at trial, thus, will suffer no prejudice by maintaining grand jury secrecy at this stage of the litigation.

## III. In the Alternative, Comey's Motion Is Not Tailored to Only Those Materials Necessary to Pursue a Motion to Dismiss.

While the Court should deny the motion outright for the reasons discussed above, if it chooses to grant some of it, the Court should restrict any such disclosure. Comey argues that no "lesser remedy than disclosure of the full grand jury proceedings" would be adequate. DE 38 at 20. According to Comey, nothing should be kept secret. But "[p]arties seeking grand jury transcripts under Rule 6(e) must show … that their request is structured to cover only material so needed." *In re Grand Jury Proceedings GJ-76-4 & GJ-75-3*, 800 F.2d 1293, 1298 (4th Cir. 1986) (quoting *Douglas Oil*, 441 U.S. at 222). Comey's sweeping request for all the grand jury materials in this case is not appropriately tailored to the purported need, if any. *See, e.g.*, *United Kingdom v. United States*, 238 F.3d 1312, 1321 (11th Cir. 2001) (explaining that in appellants' search for exculpatory evidence, their "blanket request for *all* of the unused grand jury materials … cannot be described as the kind of particularized request required for the production of otherwise secret information" (emphasis in original)). The breadth of his request only reinforces the notion that Comey's motion is a "fishing expedition" to obtain to which he is not entitled (at least at this early stage of the case). *Nguyen*, 314 F. Supp. 2d at 617.

## IV. Any Relief Should Be Limited to *In Camera* Review.

Again, Comey's motion is meritless, and the Court should deny it in its entirety. However, should the Court determine that some disclosure is appropriate, it should limit such relief to an *in camera* review. *In camera* review would both protect grand jury secrecy while allowing the Court to perform a gate-keeping function and confirm that there are no irregularities that could support dismissal of the indictment.

If, after its review, the Court orders any disclosure of the grand jury materials, the United States requests that the Court enter a protective order or modify the existing one, *see* [DE 25], to expressly prohibit Comey from making any grand jury materials public and to limit his use of the grand jury materials to his defense in this case. *See Comey*, 809 F. Supp. 3d at 414 (explaining it was "important" to the court's decision that the grand jury materials were "not being made public, at least not yet," and were being provided "under the terms of a protective order … and for the limited purpose of defending this criminal action").

**CONCLUSION**

For the foregoing reasons, the Court should deny Comey's Motion for Disclosure of Grand Jury Proceedings or, in the alternative, limit any relief to an *in camera* review, and further restrict any publication if any grand jury information is later shared with Defendant.

Respectfully submitted this 18th day of August, 2026.

W. ELLIS BOYLE
United States Attorney

*/s/ Timothy M. Severo*
TIMOTHY M. SEVERO
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Tel: 919-856-4530
tim.severo@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on August 18, 2026, I caused the foregoing document to be filed electronically through the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

**Patrick J. Fitzgerald - Special Appearance**
Patrick J. Fitzgerald Law Office
P.O. Box 277
49117
New Buffalo, MI 49117
312-758-4454
Email:
patrickjfitzgeraldlawoffice@gmail.com

Joseph E. Zeszotarski , Jr.
Local Counsel
Gammon & Zeszotarski, PLLC
P.O. Box 1127
Raleigh, NC 27602
919-521-5878
Email: jzeszotarski@ghz-law.com

*/s/ Timothy M. Severo*
TIMOTHY M. SEVERO
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Tel: 919-856-4530
tim.severo@usdoj.gov
Nc State Bar No. 19621