**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**No. 4:26-CR-00016-FL-RN**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | THE UNITED STATES' RESPONSE |
| **v.** | ) | IN OPPOSITION TO DEFENDANT'S |
| | ) | MOTION TO DISMISS INDICTMENT |
| **JAMES B. COMEY, JR.** | ) | FOR LACK OF A TRUE THREAT |
| | ) | (DE 32) |
| | ) | |

## INTRODUCTION

The Court can easily deny Defendant James B. Comey, Jr.'s motion to dismiss for purported lack of a true threat. At this stage, the issue presented is not whether Comey's "86 47" post constituted a true threat against the President—though the United States maintains that it did. Rather, the issue presented is who should answer the "true threats" question in the first instance. Comey seeks to take the question away from the jury before the government presents any evidence (or even allegations setting forth its theory of the case, given the conventional short-form indictment). No authority supports his attempt to short-circuit these proceedings.

Whether a statement constitutes a true threat depends on what the statement objectively conveys to the person on the other end, given *all* relevant factual context. In a criminal prosecution, the government must also prove that the speaker was subjectively aware that others could regard his statements as threatening. And in this case, these requirements must be considered in light of the Supreme Court's recognition of the overwhelming interest in allowing the President to perform his duties without interference from threats of violence.

Pretrial dismissal of an indictment alleging a true threat is proper only in extraordinarily narrow circumstances—if, based on the face of the indictment and the undisputed context, there is no true threat as a matter of law. Here, the indictment alleges that Comey's "86 47" social media post constituted a true threat against the President. It does not, and was not required to, go into more detail about the relevant factual context. Courts across the country have recognized that whether a statement constitutes a true threat is fact-bound, context specific, and quintessentially a matter for the jury. This case is no different. Whether Comey's post constitutes a true threat depends entirely on the sharply disputed factual context.

Comey's own motion—which goes far beyond the indictment to present an exculpatory factual narrative rooted in purportedly relevant context—confirms as much. Whether a recipient of Comey's message could objectively understand it as a threat is an inherently fact-bound question. Contrary to the broad-brush arguments in Comey's motion, Comey *himself* acknowledged that "some folks associate those numbers with violence" after deleting his post. And tellingly, Comey's motion expressly disclaims any argument about Comey's subjective awareness of the threatening nature of his post. It would be exceedingly odd for this Court to dismiss an indictment concerning a post that Comey agrees could have been understood to convey a violent message depending on the context without the government having ever had the opportunity to present evidence of that context to substantiate its allegation of a true threat. Although not required at this early stage, the government previews some of the pertinent context below. But the point is that a jury must decide the true threat question after hearing this and other evidence.

The Court should deny Comey's motion.

## BACKGROUND

The United States should not have to lay out its factual theory of the case to counter Comey's motion, which turns on the adequacy of the indictment. Indeed, given the lack of legal support for Comey's position, the motion appears more aimed at inducing the United States to show its cards before trial than to secure dismissal. Courts (including then-Judge Gorsuch) have warned about this gambit. *See, e.g.*, *United States v. Pope*, 613 F.3d 1255, 1259-60 (10th Cir. 2010) (Gorsuch, J.). The United States will nevertheless provide a partial overview to underscore some of the many contextual considerations that are not apparent from the face of the indictment—and that the jury will properly consider during and after trial when determining whether Comey's post was a true threat.

***The Heightened Assassination Threat Environment.*** President Trump has been the target of repeated assassination attempts. Before the events giving rise to these criminal proceedings, on July 13, 2024, Thomas Crooks shot President Trump in the head at a campaign rally in Butler, Pennsylvania. Crooks killed an attendee and seriously injured two others before Secret Service snipers killed him. Because President Trump turned his head just before being struck, the bullet hit his ear but did not kill him. President Trump famously stood up, pumped his fist, and implored his supporters to "Fight" before leaving the scene with Secret Service. The same month, authorities arrested a Pakistani man named Asif Merchant who arrived in the United States in April 2024 to arrange for the assassination of President Trump on behalf of Iran's Islamic Revolutionary Guard Corps. Asif has since been convicted of murder for hire and attempting to commit an act of terrorism. On September 15, 2024, Ryan Routh staked out the Trump International Golf Club with a rifle while President Trump was playing. A Secret Service agent saved the President's life by spotting the barrel of the rifle in the bushes and opening fire at Routh, who fled and was apprehended. Routh is now serving a life sentence in prison. In November 2024, the Justice Department

charged three persons with a murder-for-hire plot focused on killing President Trump as revenge for the U.S. military's killing of Iranian general Qasem Soleimani under President Trump's leadership in January 2020.

After the events giving rise to these criminal proceedings, in February 2026, Austin Tucker Martin intentionally crashed his vehicle into the security perimeter of President Trump's Mar-a-Lago resort while carrying a gas can and shotgun and was fatally shot by Secret Service agents. In April 2026, Cole Thomas Allen rushed past security at the White House Correspondents' Dinner with a firearm before being apprehended. In May 2026, Nasire Best approached a White House security checkpoint and began shooting a pistol at Secret Service officers, who killed him. And in June 2026, a group of men conspired to shoot President Trump and other administration officials during the UFC Freedom 250 event at the White House.

The threat environment for Secret Service protectees, including the President, is currently the worst the agency has ever seen.[1]

***Comey's Novel.*** On May 15, 2025, Comey was staying at a beachfront residence in Emerald Isle, North Carolina. Comey's novel "FDR Drive" was only five days from public release. As Publisher's Weekly described the novel, and as posted on Comey's Instagram, the protagonist is a federal prosecutor "trying to take down Samuel Buchanan, a far-right media personality with a popular podcast." FDR Drive, *Publisher's Weekly*, https://perma.cc/6V82-HQ9A4. [*See* Exhibit 1]. The prosecutor "believes Buchanan went far beyond the protection of the First Amendment when he singled out his enemies by name and suggested 'something should be done' about them. His fans have obliged, killing or grievously injuring some of his

---

[1] *See* Dan Mangan, CNBC, *U.S. Secret Service official: 'Threat environment is the highest we've ever seen'* (July 22, 2026), Last checked on August 18, 2026, *available at* https://www.cnbc.com/2026/07/22/secret-service-threat-trump-white-house-drones.html.

foes." *Id.* The novel itself describes the "stochastic terrorism" theory of Buchanan's offense at length:

> Sean nodded. "It's where a charismatic leader jacks people up but, through the wonder of the internet, avoids a direct connection to what comes next. *Stochastic* is a term from statistics that means you can estimate the likelihood of something happening, even if you can't predict who will do it and when and where."
>
> Jessica lifted her hand. "So it's like when King Henry II got Thomas Becket killed by simply saying, 'Will no one rid me of this meddlesome priest.?'"
>
> Benny laughed. Okay, now we're just makin' shit up. Kings? Priests? Stop. You guys have been drinking that Stolichnaya stuff."
>
> Sean smiled. "*Stochastic*, Benny. Definitely not vodka. And Jessica is spot on. But the fuller story of Henry II and Becket is closer to where I think we actually are. . . . I had to go look up the part I want to read you—what Henry *actually* said in front of his knights, after which they ran off and killed the Archbishop."
>
> Sean looked down at his notes. "Nobody was taping stuff on iPhones in 1170, but the most reliable version is that King Henry looked at his nights and actually said, 'What miserable drones and traitors have I nurtured and promoted in my household who let their lord be treated with such shameful contempt by a low-born clerk!' And the famous part was added about four hundred years later: Will none of these lazy insignificant persons, whom I maintain, deliver me from this turbulent priest?"
>
> Benny snorted. "So of course they go whack the guy. To the knights on his payroll, he's sayin' you're traitors and scumbags if you don't. That's about as close to an order as you can get. That's the way a Cosa Nostra boss would do it."
>
> "Agreed," Sean said, "and we don't have anything that good on Buchanan. We could prove to a jury that King Henry *knew* they were going to go after Becket. He knew how the knights would react, given the way he spoke to them, which is damn good proof of his intent. But we actually can get pretty close to that here. I think we can prove—and no sheikh case pun intended here—that Buchanan is *willfully* blind to the individual attacks. He knows an attack will follow his words but he closes his eyes so he can say he wasn't part of it. Under the law, that willful blindness makes him as guilty as if he did the attack himself."
>
> He turned back to the board and began drawing lines out from Buchanan's name, like the spokes of a wheel. "We can show five times he singled out someone, saying, in his word, 'They have to go' or 'They must be stopped.' Over and over again, he said that about a particular person—and within the overall

> context of 'Words aren't enough, people need to actually do something and take action.' And his listeners did exactly that—five times that we know of….
>
> The room was quiet for a moment before Nora said, "But that's okay. I don't think we need to base his intent on the perfect-attack-record thing. I think we just argue that he *had* to know his words would result in the attacks. He may not have known the identity of his knights, but he knew they were out there and would act on his words. So he just shouted that they were—what were the king's words? 'Miserable drones and traitors'?—if they didn't get rid of the people he named. He knew what his knights would do. That should be enough to prove he intended it to happen.
>
> "And don't forget, we have someone on the inside who saw it all happen, and she believes he knew what he was doing and wanted it to happen. What did Becky say the other day? Something about Buchanan talks like he's motivated by the cause, but he's really in it for the increased donations after each attack? It all fits."
>
> She looked at Jessica and Benny, who were nodding.
>
> "Fuckin' A," Benny mumbled.[2] [*See* Exhibit 2]

Later in the book, a fictional expert witness researcher whose specialty is the online pathways through which individuals are drawn to ideologically motivated violence[3] testifies to a jury:

> Those are people who are susceptible to messages that offer a sense of purpose through violence. …With a sad look, she explained that messages about violence always resonate more powerfully among young men. For a variety of reasons related to brain development and hormones, young men find violence more attractive as a source of meaning than women or older men do. The most effective radicalizing messages are those that tell consumers, especially young men, that they are special, that they are under siege, and that the noble course is to fight back against their enemies. It's a message that has worked for all human history, she explained. The Middle Ages had no social media, but recruiters still managed to convince thousands to leave their homes and fight a holy war in far-off Jerusalem. Of course, she added, the power of social media is that the recruiter doesn't need to ride on horseback to your medieval village; he's in your pocket reaching you constantly through your buzzing phone. It's

---

[2] Comey, James, FDR Drive, Mysterious Press, (2025), pages 62-63.
[3] *Id*. at 218.

> an order of magnitude more effective, she said, and more dangerous.[4] [*See* Exhibit 3]

***Comey's Social Media Post.*** On May 15, 2025, a charismatic leader named James Comey, through the wonder of the internet, posted a coded message to his followers meaning "kill" or "get rid of" (a euphemism for "kill") President Trump. [DE 33 at 6]. Comey has acknowledged taking the picture of the seashells on May 15.

To be sure, Comey's account suggests any similarity between his conduct and his novel are coincidental. But he has claimed that he and his wife were on a beach walk and happened upon seashells arranged in an "86 47" pattern. Of course, even if Comey did not arrange the seashells himself or plan his post in advance, that would not change the threatening nature of his post. The shells were located four miles down the beach from the beachfront property where Comey was staying, in an area separated from the ocean by a sand dune. And there is no evidence that anyone else arranged, photographed, or even saw the shells. He took a photo of the shell message with his phone at 1:56 pm. [*See* Exhibit4 ].

At 3:12 pm, Comey's wife sent him a screenshot of what appeared to be a partial (cropped) definition of "U.S. English slang" indicating that "86" means "to get rid of or refuse service." [*See* Exhibit 5] Two minutes later, at 3:14 pm, Comey posted a picture of the seashells on his Instagram account with the caption "Cool shell formation on my beach walk."

There is no serious dispute that an objective viewer of Comey's post could read it to mean "Kill President Trump." Comey has admitted that the "47" referred to President Trump. And Cassell's Dictionary of Slang (2nd edition) defines "86" to mean:

> to throw out, get rid of (1940's), (1970) to kill, to murder to execute judicially, (1980) to be finished ready to leave or out of an item or be exhausted.[5] [*See* Exhibit 6].

---

[4] *Id*. at 219–20.
[5] At least one court has relied on Cassell's Dictionary of Slang. *United States v. Parker*, No.: 8:09-CR-0162, N.D.N.Y., August 7, 2009, *12, n.10 (2009 WL 2473510). Cassell's Dictionary

Wikipedia entry available through Google on May 15, 2025 (last updated prior to May 15, 2025, on April 27, 2025)[1], includes this excerpt: "According to Cassell's Dictionary of Slang, "to 86" also means "to kill, to murder; to execute judicially," likely referring to the size of a standard grave being 2.5 feet wide by 8 feet long and 6 feet deep. Other slang dictionaries confirm this definition." [*See* Exhibit 7]. On May 15, 2025, Merriam Webster.com had an article available titled "What does 'eighty-six' mean?" that included the following statement: "Among the most recent senses adopted is a logical extension of the previous ones, with the meaning of "to kill." We do not enter this sense, due to its relative recency and sparseness of use." [6]

Similarly, on May 15, 2025, Merriam Webster.com had an article available titled "What does 'eighty-six' mean?" that included the following statement: "Among the most

---

of Slang has also been cited in multiple law journal articles, including: Yale Journal of Law & the Humanities, The Woman Will Be Out: A New Look at the Law in Hamlet, 20 YJLH 31, 59 at n.149 (Spivack, 2008); Houston Law Review, "Election" of Remedies: The City of Houston, the Sister Courts, and the Mission to Interpret the Tort Claims Act, 50 Hous. L. Rev. 1507, 1532 at n32 (Wischnewsky, 2013); Mississippi College Law Review, Four for the Fifth: The First Mississippi Judges on the Fifth Circuit, 34 Miss. C. L. Rev. 233, 243 at n.31 (Southwick, 2015); Yale Journal of Health Policy, Law & Ethics, Decentralizing STD Surveillance: Toward Better Informed Sexual Consent, 12 Yale J. Health Pol'y, L. & Ethics 1, 4 at n.19 (Fan, 2012); New York University Review of Law and Social Change, A 'Ho New World: Raced and Gendered Insult as Ersatz Carnival and the Corruption of Freedom of Expression Norms, 33 N.Y.U. Rev. L. & Soc. Change 43, 49 at n.22 (Inniss, 2009); Loyola of Los Angeles Law Review, Super Size me and the Conundrum of Race/Ethnicity, Gender, and Class for the Contemporary Law-Genre Documentary Filmmaker, 40 Loy. L.A. L. Rev. 687, 708 at n.84 (Austin, 2007), and; UIC John Marshall Law Review, "What I Said was 'Here is where I can Cash in'" the Instrumental Role of Congressman Hatton Sumners in the Resolution of the 1937 Court-Packing Crisis, 54 IUC J. Marshall L. Rev. 379, 427 at n.282 (Daniel, 2021).

[6] https://www.merriam-webster.com/dictionary/86

recent senses adopted is a logical extension of the previous ones, with the meaning of "to kill." We do not enter this sense, due to its relative recency and sparseness of use."[7]

Past news stories have used the phrase "86" to describe killing.[8] And a former mob boss has informed the FBI that in his world, "everyone knew" that 86 meant "kill," and given Comey's experience as FBI Director, there is "no way that Comey did not know that." In any event, as noted above, in Comey's own novel "Nora" expressly uses the euphemism "get rid of" (and the novel generally uses other similar phrases) as equivalent to "kill."

***Public And Private Reaction.*** When Comey's post appeared, there was immediate public outcry. In Emerald Isle, at least two residents, one employed by the Police Department, notified the Emerald Isle Chief of Police. At least one relative of Comey also understood the post's apparent meaning. The relative texted Comey's wife: "You guys have really gone off the deep end over the years with your TDS [Trump Derangement Syndrome]. 8647 is a call for violence no matter how you spin it. You should be ashamed of yourselves. . . . I hope Jim goes to jail for his crimes." Comey's wife responded denying that the post had been a call to violence. [*See* Exhibit 8 ].

Comey deleted the post later that day. He has claimed he did so in response to the text from his relative. Comey also put up a new post stating:

> I posted earlier a picture of some shells I saw today on a beach walk, which I assumed were a political message. I didn't realize some folks associate those numbers with violence. It never occurred to me but I oppose violence of any kind so I took the post down. [*See* DE 33 at 8].

---

[7] Last checked on August 18, 2026: Eighty-six, Merriam-Webster, https://www.merriam-webster.com/dictionary/86.

[8] John Kifner, W*AR IN THE GULF: War Notebook; This Time, 'Good to Go' Is American Battle Cry*, N.Y. Times (Feb. 3, 1991), https://www.nytimes.com/1991/02/03/world/war-in-the-gulf-war-notebook-this-time-good-to-go-is-american-battle-cry.html.

While he initially refused to provide his address at the beach house to be interviewed on the night of May 15, Comey later told the Secret Service (which, along with the FBI, investigated the potential threat) that Comey had interpreted "86" as a term meaning to "ditch, dump, or replace" and "47" as representing President Trump. Despite Comey's experience in federal government, he did not explain how a second term President with a nearly evenly divided Congress could realistically be ditched, dumped, or replaced—that is, gotten rid of—through ordinary political means.

As the post continued to generate controversy, Comey sent a text message stating: "This is provoking me to be more vocal, which I will start next week in NYC (including a return to Colbert)." [*See* Exhibit 9]. The next day, Comey's publishing agent texted him: "Hey Jim, I'm sure you're dealing with a lot of BS right now. I have a message from ABC which I'll forward to you. Let me know if I can be of assistance." Comey responded quickly: "Thanks, it is truly crazy. But I'm not speaking to any media." A few minutes later, his publishing agent wrote: "Also on the bright side you've gone viral." Comey quickly replied: "Not my intention, but I'll be OK if it sells books." The publishing agent responded: "Music to an agent's ears." [*See* Exhibit 10]. In his interview to promote his new book with the Wall Street Journal published on May 23, 2025, Ellen Gamerman asked him: "Is there a universe where you did this to promote your book?" to which Comey responded: "Not in a universe I live in."[9]

On May 20, 2025, Comey appeared as a guest on the Late Show with Stephen Colbert to discuss his book release:

> Colbert: "You stirred up a little controversy recently. I was gonna say you landed in hot water, but it's just water. Because I don't know if you did

---

[9] Ellen Gamerman, *James Comey on His New Thriller, Those Seashells and That Signal Chat*, The Wall Street Journal (May 23, 2025), https://www.wsj.com/arts-culture/books/james-comey-seashells-trump-8647-book-fdr-drive-93dee8ed?msockid=03e31da23b0b6c242fc20a0c3ab66d68.

this on purpose just to get attention here, but your Instagram this you were walking on the beach. What happened? You were walking on the beach, you saw this on the beach?"

COMEY: "Yeah, my wife and I, Patrice, were walking on the beach and saw those numbers in shells on the beach."

Colbert: "You didn't do this? Somebody else did this?"

COMEY: "Yeah, somebody else did it. We were on a walk preparing for this week, the rollout of my book. She looked at it and said, "Why did someone put their address in the sand?" And we stood at it, trying to, looked at it trying to figure out what it was. And she had long been a server in restaurants and she said, "You know what I think it is, I think it is a reference to restaurants when you "86" something in a restaurant." And I said, "I would…"

Colbert: "Right, its off the menu."

COMEY: "yeah, nah I remember when I was a kid, you'd say "86" to get out of a place. This place stinks, let's "86" it."

Colbert: "I was a bartender, you would "86" a customer if they were getting drunk. Like, let's "86" him, give him a low proof alcohol or something like that. Yeah"

COMEY: "And so I said, "I think it's a clever political message." And she said, "You should take a picture of it." I said, "sure." And then she said, "You should Instagram that." And BOOM." [*See* Exhibit 11, manual filing].

Later in the interview, Colbert said: "OK, well congratulations on the attention for, for your book. There you go. That is a hell of a viral campaign."[10] *Id.*

A grand jury returned an indictment against Comey charging him with violating 18 U.S.C. §§ 871(a), 875(c) for knowingly and willfully threatening to take the life of the President and transmitting that communication in interstate commerce.[11]

---

[10] Last checked on August 18, 2026: https://www.youtube.com/watch?v=KRs-KSczhOA (*See also* Exhibit 10 Attachment of Colbert Interview)

[11] Federal Rule of Criminal Procedure 6(e) limits the government's ability to describe what information was presented to the grand jury. The government's recounting of some of the underlying facts of this case is not an admission as to what was presented to the grand jury.

## ARGUMENT

### I. THE "TRUE THREAT" TEST IS INHERENTLY CONTEXT-DEPENDENT

"True threats of violence is a[] historically unprotected category of communications." *Counterman*, 600 U.S. at 74. "Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat." *Id.* (citing *Elonis*, 575 U.S. at 733). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* (quoting *Elonis*, 575 U.S. at 733). "When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to 'fear of violence' and to the many kinds of 'disruption that fear engenders.'" *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 360 (2003)). The question, then, is whether a statement is one that "a reasonable recipient familiar with the context would interpret as a serious expression of intent to do harm." *United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016).

Accordingly, what matters is the "*entire* factual context." *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990), *abrogated on other grounds by Black*, 358 U.S. 359-60; *see also Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021). Especially "[w]here a statement may be ambiguous, the entire context . . . may assist the jury in determining whether that ambiguous statement was a threat." *United States v. Fulmer*, 108 F.3d 1486, 1495-96 (1st Cir. 1997).

Many contextual considerations may be pertinent. They often include "surrounding events." *Orozco-Santillan*, 903 F.2d at 1265. The reactions of the recipients of a message can be relevant, too. *United States v. Roberts*, 915 F.2d 889, 890-91 (4th Cir. 1990); *accord*

*Orozco-Santillan*, 903 F.2d at 1265 (considering the "reaction of . . . listeners").[12] When listeners alert law enforcement, it strengthens the likelihood that a threat has been conveyed. *See, e.g.*, *United States v. Spruill*, 118 F.3d 221, 228 (4th Cir. 1997) (person answering calls for law enforcement agency "felt that the threat was serious enough to justify patching the call through" to a special agent); *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000) (relevant persons "contacted the police"); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) (recipient requested protection from local sheriff). If informed of a statement, the FBI's and/or Secret Service's view of the statement as a potential threat can be pertinent as well. *Roberts*, 915 F.2d at 891 (relying in part on fact that Supreme Court Police and FBI viewed letter as threat); *United States v. Hoffman*, 806 F.2d 703, 712 (7th Cir. 1986) (considering response of Secret Service).

By contrast, certain factors are categorically *not* relevant. For example, "[t]he speaker need not actually intend to carry out the threat." *Black*, 503 U.S. at 359-60. Nor does the speaker need to "have the capacity to do so." *United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017); *accord United States v. Viefhaus*, 168 F.3d 392, 395-96 (10th Cir. 1999) ("It is not necessary to show that defendant intended to carry out the threat, nor is it necessary to prove he had the apparent ability to carry out the threat."). Walking back a threat also does not change the fact that a threat was made in the first place. *See, e.g., United States v. Cessor*, 30 F.4th 736, 737-39 (8th Cir. 2022). And "the fact that a specific threat accompanies pure

[12] *Accord, e.g.*, *United States v. Wheeler*, 776 F.3d at 745-46; *United States v. Mabie*, 663 F.3d 322, 330-31 (8th Cir. 2011) (en banc); *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006); *United States v. Alaboud*, 347 F.3d 1293, 1298 (11th Cir. 2003); *United States v. Nishnianidze*, 342 F.3d 6 (1st Cir. 2003); *Doe ex rel. Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616, 624 (8th Cir. 2002); *United States v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001); *United States v. Magelby*, 241 F.3d 1306, 1311 (10th Cir. 2001); *United States v. Saunders*, 166 F.3d 907, 913 (7th Cir. 1999); *United States v. Fulmer*, 108 F.3d 1486, 1500 (1st Cir. 1997); *United States v. J.H.H.*, 22 F.3d 821, 827 (8th Cir. 1994); *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994); *United States v. Roberts*, 915 F.2d 889, 890-91 (4th Cir.1990); *United States v. Davis*, 876 F.2d 71, 73 (9th Cir. 1989).

political speech does not shield a defendant from culpability." *Viefhaus*, 168 F.3d at 396. For example, the Eleventh Circuit determined that a threat to kill the President was not protected as "political hyperbole" just because it appeared in a social media post that also criticized the President's policies. *United States v. Castillo*, 564 F. App'x 500, 503 (11th Cir. 2014).

## II. THE "TRUE THREAT" QUESTION CANNOT BE RESOLVED BEFORE TRIAL

Given the required contextual analysis, it is no surprise that "[g]enerally, what is or is not a true threat is a jury question." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 692 (4th Cir. 2018) (quoting *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir. 1990); *accord United States v. Burger*, 170 F.4th 395, 403 (5th Cir. 2026) ("Whether a statement is a true threat is generally a question for the jury.").[13] A court cannot dismiss an indictment unless it is clear from the face of the indictment that no violation has occurred. But the entire context of Comey's statement is not apparent from the face of this short-form indictment. The heart of this case is a dispute over what that context means. Only a jury can resolve that dispute.

### A. Dismissal Of An Indictment Is Improper When Contested Facts Would Be Of *Any* Assistance In Determining Whether A Violation Occurred

"[C]ourts lack authority to review the sufficiency of evidence supporting an indictment." *United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003). "An indictment

---

[13] Comey relies on an earlier, unpublished Fifth Circuit decision and two earlier district court decisions (one of which is over 80 years old) from courts within the Fifth Circuit. *See* DE 33 at 10, 11 (citing *United States v. O'Dwyer*, 443 F. App'x 18 (5th Cir. 2011) (per curiam); *United States v. Cook*, 472 F. Supp. 3d 326 (N.D. Miss. 2020); *United States v. Daulong*, 60 F. Supp. 235 (W.D. La. 1945)). In *O'Dwyer*, the court did not discuss what information was or was not included in the indictment. But *Burger* makes clear that in the Fifth Circuit, like every other circuit, courts may not go beyond the face of the indictment when "the correct characterization of the context is disputed" to grant a motion to dismiss. *See Burger*, 170 F.4th at 405 ("*O'Dwyer* does not contain any reference to testimony that would shed light on the context of these communications, and such context appears to have been agreed.").

returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for a trial of the charges on the merits." *United States v. Mills*, 995 F.2d 480, 487 (4th Cir. 1983). And when an indictment "tracks the language" of a statute such that it "properly allege[s] each element" of an offense, "the indictment is valid on its face." *Wills*, 346 F.3d at 489; *see also United States v. Engle*, 676 F.3d 405, 416 (4th Cir. 2012) ("[A]n indictment is legally sufficient (1) if it alleges the essential elements of the offense . . . ; and (2) if the allegations will enable the accused to plead an acquittal or conviction[.]" (internal quotation marks omitted)).

In other words, a court "may not dismiss an indictment . . . on a determination of facts that should have been developed at trial." *Engle*, 676 F.3d at 415. "Evidence beyond the face of the indictment should not be considered." *Id.* at 415 n.6 (quoting *United States v. Forrest*, 1999 WL 436743 (4th Cir. 1999)). To be sure, trial courts can resolve certain pretrial motions, including—in rare circumstances—motions to dismiss charges. But Rule 12 of the Federal Rules of Criminal Procedure "authorizes the district court to resolve before trial only those motions 'that the court can determine *without a trial of the general issue*.'" *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.) (quoting Fed. R. Crim. P. 12(b)(2) (emphasis in *Pope*)). The "'general issue' is 'defined as evidence relevant to the question of guilt or innocence.'" *Id.* (quoting *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005)). Accordingly, "the Supreme Court has instructed, Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of *no assistance* in determining the validity of the defense.'" *Id.* (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)); *see also United States v. Knox*, 396 U.S. 77, 83 n.7 (1969) (Rule 12 "cautions" that "evidentiary questions" such as whether

the defendant actually had the requisite *mens rea* "should not be determined" on a pretrial motion to dismiss the indictment).

Although "many and various" reasons support this rule, "[p]erhaps the most prominent among them is respect for the role of the jury," which is "charged with determining the general issue of a defendant's guilt or innocence," leaving no room for "fact-finding by the district court based on evidence that goes to this question." *Pope*, 613 F.3d at 1259. But there are additional reasons, too. "Even when the court is ultimately responsible for deciding the merits of a legal defense, . . . evidence adduced at trial can provide a 'more certain framework' for its analysis—particularly when it isn't clear before trial precisely what evidence will and won't be admissible." *Id.* (quoting *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997). "And, of course, it also disserves judicial economy to hold a separate 'mini-trial' on a defense only to repeat the exercise with largely the same evidence a short time later at the trial itself," such that the "pretrial hearing . . . wind[s] up being little more than a dress rehearsal that is not only needlessly repetitive but that might also facilitate an end-run around the limited discovery rules governing criminal prosecutions." *Id.* (internal quotation marks and alterations omitted). "After all, unlike their civil counterparts, criminal proceedings have no extensive discovery and summary judgment procedures requiring both sides to lay their evidentiary cards on the table before trial." *Id.* at 1259-60.

This means courts can resolve a pretrial motion to dismiss only when such a motion hinges on a "purely legal question." *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) (addressing a pure question of statutory interpretation, where the government had stipulated to all pertinent facts). As relevant here, such a motion would need to ask "whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense." *Pope*, 613 F.3d at 1260 (internal quotation marks omitted). Such a motion "doesn't

require a *trial* because it focuses solely on the facts alleged in the indictment and their *legal* adequacy." *Id.* For example, dismissal was proper in *United States v. Brewbaker* only because the facts in the long-form "speaking indictment" itself could not support (as a matter of law) the antitrust legal theory in the same indictment. *See* 87 F.4th 563, 570 (4th Cir. 2023); *see id.* at 573-83. That "legal question" did not and could not hinge on "*any* extrinsic factual evidence." *Id.* at 579 (emphasis added).

Such dismissals "are the rare exception." *Pope*, 613 F.3d at 1260. "[T]hey are not made on account of a lack of evidence to support the government's case," or even "the government's refusal to come forward with [such] evidence." *Id.* Indeed, "even *latent* factual disputes over circumstances surrounding the commission of the alleged offense can sometimes prevent pretrial determination of a defense." *Id.* at 1261. If any "disputed facts outside the indictment must be found in [the defendant's] favor," dismissal is improper. *Id.*

### B. Because The Indictment Is Not Facially Insufficient As A Matter Of Law, Dismissal Is Improper

Whereas a court may resolve only pretrial questions "without reference to the circumstances of the alleged offense," *Covington*, 395 U.S. at 60, "when it comes to the true-threats analysis, 'context is critical,'" *Burger*, 170 F.4th at 402 (quoting *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023)).

In the vast majority of cases, the context-focused true threats standard naturally lends itself to contested factual questions that a jury must resolve. *See, e.g.*, *Burger*, 170 F.4th at 403-06; *Wheeler*, 776 F.3d at 745. After all, "the true threat standard . . . constrains the role of judges and instead relies upon the sensibilities of ordinary people," such that a "court is no better equipped than the jury—and is arguably less equipped—to answer whether a statement is a true threat." *United States v. Hunt*, 82 F.4th 129, 136 (2d Cir. 2023). At a minimum, whenever there is a question "whether the context" of a statement

"would lead a reasonable" person to interpret a statement as a threat, additional testimony would typically "at the very least 'provide a more certain framework for the district court's analysis.'" *Burger*, 170 F.4th at 405 (quoting *Pope*, 613 F.3d at 1259) (alterations omitted). At least so long as "how th[e] context affects the 'true threats' analysis" is disputed, "and that analysis would be materially incomplete without further evidence" beyond what is included in the indictment, there must be "a trial on the merits." *Burger*, 170 F.4th at 405-06 (citing *United States v. Rodriguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019)).

That is clearly the case here. The indictment states that Comey violated 18 U.S.C. §§ 871(a), 875(c) because he "publicly posted a photograph on the internet social media site Instagram which depicted seashells arranged in a pattern making out '86 47,' which a reasonable recipient who is familiar with the circumstances would interpret as a serious expression of intent to do harm to" the President. Dkt. 1 at 1-2. From that language alone, it is not possible to assess the pertinent context. Indeed, the government is not required to "come forward" with such context at all given the limited information in the indictment and the required true threats analysis. *See Pope*, 613 F.3d at 1260. All that matters is that additional evidentiary context "might shed light on" the question. *Id.* at 1263.

That said, the context of Comey's conduct described above underscores the absurdity of Comey's legal position. Such context includes, but is not limited to, the heightened threat environment, the backdrop of Comey's eerily on-the-nose novel, the different common usages of the phrase "86 47," the phrase's use as a term of art in the context of organized crime, Comey's professional experience with such crime, the reactions of persons who viewed the post, the reactions of law enforcement officers including the FBI and Secret Service, and Comey's apparent financial incentive to stir up controversy. In the midst of an unprecedented threat environment against the President, just days before releasing a book about a charismatic public figure who publicly conveys messages instructing his followers to "get rid

of" his political enemies, leading to the actual killing of those enemies (in part to generate interest and money from those same followers), Comey posted a message that many observers, including federal and local law enforcement officers, reasonably interpreted to mean "kill President Trump." All of that (and more) is relevant to the true threats analysis. Almost none of it is apparent from the indictment. The jury must decide whether that and any other pertinent context is enough for a conviction.

### C. Comey Offers No Reason To Depart From Settled Law Requiring A Jury To Decide The "True Threats" Question

Comey's own factual assertions, and the inapt caselaw he cites, only confirm that his motion should be denied out of hand. Comey expressly declines to raise any argument disputing his awareness "that others could regard his statements as threatening violence." *Counterman*, 600 U.S. at 79; *see* [DE 38 at 10 n.1]. Instead, he focuses on the equally fact-intensive question whether a reasonable person would understand his post as a threat.

Tellingly, Comey concedes that when it comes to that question, a "contextual approach" controls. [DE 33 at 11]. And the bulk of Comey's motion—and the entirety of his lead argument—relies on purported "context" that is not in the indictment. *See Id. at* 11-16 (arguing about how the phrase "86 47" has been used in various settings, including in "political discourse on . . . social media," describing a Political Action Committee and merchandise that used the phrase "86," and Comey's "Instagram posts preceding his May 15, 2025 seashells post"); *see also id.* at 3-7 (setting forth factual narrative going far beyond content of the indictment). Indeed, Comey effectively concedes that context is pertinent to how a speaker intends to use the phrase "86." *See id.* at 12. Rather than argue the phrase has a single objective meaning, he acknowledges that "86" has at least "in more recent times" and "on isolated occasions" been used to mean "to kill." *Id.* And of course, Comey himself previously admitted that "some folks associate those numbers with violence." *See* p. 9, *supra*.

So the (disputed) "context" (which in the United States' view also includes how "get rid of" is construed in context) is "relevant" to the true threats question. DE 33 at 13.

Accordingly, there is no question that "how th[e] context affects the 'true threats' analysis" is disputed. *Burger*, 170 F.4th at 405. Comey appears to largely agree. But he misses the obvious implication: because the context is not in the indictment and is sharply disputed, it cannot be a basis for dismissing the indictment. *Engle*, 676 F.3d at 415 & n.6. "Where a statement may be ambiguous, the entire context . . . may assist *the jury* in determining whether the ambiguous statement was a threat." *Fulmer*, 108 F.3d at 1495-96 (emphasis added). All of this means that evidentiary development would, at a minimum, "provide a more certain framework for the district court's analysis.'" *Burger*, 170 F.4th at 405 (quoting *Pope*, 613 F.3d at 1259).

Comey simply ignores the pre-indictment posture of his motion. Many of the cases he cites were decided in a post-conviction, civil, or other materially distinguishable posture, where evidence has been developed and/or different discovery rules apply. *See Watts v. United States*, 394 U.S. 705 (1969) (reviewing jury conviction); *Rankin v. McPherson*, 483 U.S. 378 (1987) (reviewing grant of summary judgment); *United States v. Al-Timimi*, 164 F.4th 292 (4th Cir. 2026) (jury conviction); *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion) (conditional guilty plea allowed appeal of Stolen Valor Act issue). Then-Judge Gorsuch has explained the markedly different rules and analyses that apply in such contexts. *Pope*, 613 F.3d at 1259-60. So, at most, these cases suggest Comey may be able to raise the arguments in his motion to the jury and potentially to the court after trial.

For the same reasons, Comey's reliance on *Accountability Now USA v. Griess*, 2026 WL 1870626 (D.D.C. June 29, 2026), fails. *See* DE 33 at 15. That civil case did not involve a pre-trial motion to dismiss, so a materially different legal standard applied. *See* 2026 WL

1870626, at *5-6 (considering "evidence" at "summary judgment" stage). In any event, the court acknowledged that "86" has "no single meaning," and in some contexts can mean "to kill." 2026 WL 1870626, at *15. The "context" that mattered there was the "context surrounding [the] Plaintiff's display of a flag," which was "part of a demonstration calling for President Trump's impeachment." *Id.* at *11, 14; *see also id.* at *15 (focusing on "the specific context at hand"). Of course, that context is not this context.

Comey's argument that his post was "political hyperbole" suffers from all the same flaws. [DE 33 at 16]. Comey relies on cases like *Watts, Rankin*, and *Accountability Now* that assessed fully-developed records to conclude that statements were not true threats based on the unique facts. *See id.* at 17-19. Here, such facts are absent from the indictment.[14] Particularly given that a true threat can mix with "political speech," *Viefhaus*, 168 F.3d at 396, Comey's "hyperbole" argument only underscores the need for a sensitive, context-based analysis that is not possible based on the indictment alone.

Comey identifies just two out-of-circuit cases upholding the dismissal of a true threats indictment—but each illustrates why dismissal would be improper here. The indictment in *United States v. Landham* was invalid on its face because it alleged (i) a threat to kidnap by a parent who could not "legally be charged with kidnapping" his own child; and (ii) a statement describing "past conduct," rather than threatened future conduct, where that past conduct concerned mere "written communications." *See* 251 F.3d 1072, 1081-1082 (6th Cir. 2001). It was enough to read the indictment to know the charges failed as a matter of law. Similarly, in *United States v. Alkhabaz*, the indictment failed to set forth what the Sixth

---

[14] Both *Watts* and *Rankin* also discussed "if, … then" conditional statements. *See Watts*, 394 U.S. at 707 (statement "was expressly made conditional upon an event . . . which petitioner vowed would never occur"); *Rankin*, 483 U.S. at 381 ("if they go for him again, I hope they get him"). "Kill President Trump" and "Get Rid Of President Trump" are not conditional statements.

Circuit erroneously believed was a required element of the charged offense (that a threat be "conveyed to effect some change or achieve some goal through intimidation"). 104 f.3d 1492, 1496 (6th Cir. 1997); *see also United States v. Doggart*, 906 F.3d 506, 512 (6th Cir. 2018) ("this aspect of *Alkhabaz* is no longer the law of the circuit"). The court did not hold that it could consider disputed context beyond the indictment. And more recently, the Sixth Circuit approved a district court's determination that the court "could not 'opine, analyze, or further discuss' whether . . . statements constituted true threats because 'factual issues remain the duty of the jury.'" *United States v. Killingsworth*, 2022 WL 294083, at *4-5 (Feb. 1, 2022).[15]

Comey's argument that, even if violent in nature, his post did not convey an "indication of *his* intent to engage in a violent act," DE 33 at 20, is also without merit. "[N]o particular formulation of words is required to state a true threat." *United States v. Christenson*, 653 F.3d 697, 701 (8th Cir. 2011). And whether "Kill President Trump" can be read to imply some intent by the speaker—once again—depends on context that is not in the indictment.

Regardless, even with the benefit of evidentiary development, courts have repeatedly rejected this precise argument when it comes to statements suggesting the President should be killed (by whatever means). Where a defendant "stated or at least suggested that the President should be killed," in context such statements could reasonably "be perceived as threats" even though the defendant "did not explicitly indicate that *he* was going to kill the

---

[15] Comey also relies on *United States v. Stock*, where the Third Circuit affirmed a district court's *denial* of a motion to dismiss a true threats indictment. 728 F.3d 287, 290 (3d Cir. 2013). Although the court noted that "a court may conclude that a communication does not constitute a threat as a matter of law in certain cases," it emphasized that, "[i]n the usual case," that question "is a matter to be decided by the trier of fact" in light of "the context." *Id.* at 297-99. To the extent any dicta in *Stock* could be construed as supporting a requirement that a true threats indictment must contain detailed context, *see id.* at 301, Comey does not argue there is any such requirement, which would be manifestly inconsistent with Fourth Circuit caselaw. *E.g.*, *Wills*, 346 F.3d at 489; *Engle*, 676 F.3d at 416.

President" and did not send any of the letters containing such suggestions to the President, his aides, or any federal agencies. *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002); *see also id.* at 1082. A defendant's possession of an envelope bearing the phrase "Murder the President," as reinforced by the defendant's subsequent statements "that the President should be killed" and other contextual factors, was sufficient. *United States v. Carrier*, 708 F.2d 77, 78-79 (2d Cir. 2983).[16] And the Eighth circuit similarly rejected a defendant's argument "that he simply expressed a wish that the President suffer harm, rather than a declaration of his own intent to cause harm to the President." *Christenson*, 653 F.3d 697, 701 (8th Cir. 2011) (addressing, among other statements, "kill Obama").

The underlying logic of these decisions is straightforward. "Exhorting groups of followers to kill specific individuals can produce fear in a recipient no less than more traditional forms of threats." *United States v. Wheeler*, 776 F.3d 736, 745 (10th Cir. 2015). "Allowing defendants to seek refuge in the First Amendment simply by phrasing threats as exhortations would . . . leave the state 'powerless against the ingenuity of threateners.'" *Id.* (quoting *United States v. Turner*, 720 F.3d 411, 422 (2d Cir. 2013)). And if there were any doubt, "the reason why threats of violence are outside the First Amendment . . . have special force when applied to the person of the President," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992), given the "overwhelming interest in protecting the safety of the Chief Executive and in allowing him to perform his duties without interference from threats of physical violence," *Watts v. United States*, 394 U.S. 705, 707 (1969) (alterations omitted).

---

[16] Notably, the Second Circuit reached this conclusion after trial—having previously reversed the dismissal of the indictment on the ground that whether the "words used are a true threat is generally best left to the triers of fact" given that the "[s]urrounding factual circumstances may not easily be required to be recounted in all indictments." *United States v. Carrier*, 672 F.2d 300, 306 (2d Cir. 1982).

Comey's contrary argument badly overreads Fourth Circuit precedent. He points to *White*, 670 F.3d at 513. But the statements at issue in that case were different. *White* did not concern statements that could be read to mean "Kill" anyone—let alone the President. Instead, after an activist's house was firebombed, the defendant had said "someone do it to" another activist and expressed a belief that the activist "should be . . . shot" and "must be killed." *Id.* at 513. The Fourth Circuit acknowledged that "a direct threat . . . would not always be necessary," as "personal or group involvement in the threat" is not "an essential component" of a true threat. *Id.* at 513. The court simply held that given the particular context, where the statement was not conveyed "to the threatened individual" *and* there was no "personal or group involvement" *and* "the language was clearly directed at others in the form of advocacy," among other pertinent details, the entire context militated against an "intent to commit harm." *Id.* (emphasis omitted). As always, the court's assessment was based on "[t]he facts proved at trial," and the resulting "context," not the face of the indictment. *Id.* at 501-02, 513. Accordingly, *White* does not support a "bright-line rule" that "exhortations to unspecified others to commit violence cannot amount to true threats." *Wheeler*, 776 F.3d at 744 (rejecting such a rule purporting to be based on *White*). Indeed, to the extent such a rule would rest on a binary distinction between threats and incitement, "*no court* has suggested that the categories of unprotected speech are completely distinct." *Id.* at 745.

*White* is thus plainly inapposite. Here, no facts have been proved, and there is no context to evaluate. Even if the court were to consider facts beyond the indictment, Comey conveyed his statement (referring to the President) to the public writ large (including the President) on social media. "[T]he line between threats and incitement, especially in cyberspace, is not as clear as [Comey] contends." *Wheeler*, 776 F.3d at 745. And to the extent

Comey argues there must be some "intent to inflict bodily harm," DE at 20 (citing *Landham*, 251 F.3d at 1082), that just begs the question whether the entire factual context supports such an intent.

With no colorable argument that the indictment is insufficient "on its face," *Mills*, 995 F.2d at 487, Comey resorts to thematic arguments about "political advocacy," a purported "chilling effect," and "our Nation's most cherished guarantees," DE 33 at 22, 26, 29 (formatting modified). But all those arguments assume the conclusion that Comey's statements weren't unprotected true threats. If anything is consistent with "our Nation's history and tradition," *id.* at 22 (formatting modified), it is that "[f]rom 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas," including "[t]rue threats." *Counterman*, 600 U.S. at 73-74. Comey's argument that the facially valid indictment will chill protected speech because the indictment is "unfounded," [DE 38 at 27] (formatting modified), only confirms the need for evidentiary development to see whether that is the case.

Without such development, Comey's high-level constitutional platitudes ring hollow. They are also hypocritical. In the Federalist Papers, Alexander Hamilton noted:

> The friends and adversaries of the plan of the [constitutional] convention, if the agree in nothing else, concur at least in the value they set upon the trial by jury; or, if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government.

*The Federalist* No. 83 (Alexander Hamilton). Comey's arguments betray a lack of "respect for the role of the jury" throughout. *Pope*, 613 F.3d at 1259.

**CONCLUSION**

For the foregoing reasons, the Court should deny James B. Comey Jr.'s motion to dismiss for purported lack of a true threat.

Respectfully submitted this 18th day of August, 2026.

W. ELLIS BOYLE
United States Attorney

*/s/ Timothy M. Severo*

TIMOTHY M. SEVERO
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Tel: 919-856-4530
tim.severo@usdoj.gov
NC State Bar No. 19621

## **CERTIFICATE OF SERVICE**

I certify that on August 18, 2026, I caused the foregoing document to be filed electronically through the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

*/s/ Timothy M. Severo*
Timothy M. Severo