
NEW YORK TIMES BESTSELLING AUTHOR
JAMES COMEY
FDR DRIVE
A CRIME NOVEL
"An expert storyteller."—MICHAEL CONNELLY

He dropped the sandwich back onto the butcher paper and turned to Buchanan. "Little help here?"

Buchanan spoke gently. "I have to agree with Matthew, my tupelo honey. We don't want to make this case about either the people who got hurt or about whether America faces an existential threat. Of *course* it does—you and I and millions of others see it—but the people here, in their gas-stove-hating, gender-is-a-construct, borders-are-immoral blue bubble are never going to see it that way. It's a fight we can't win here. Of course, it's a fight we *must* win as a country, and I'll stay in the fight, but not if I'm in a federal prison. You follow me, sugar?"

Pond slowly nodded her head in agreement. "And I still think you should let me do the opening or the summation."

They ate in silence.

# CHAPTER THIRTY-SEVEN

Emily Hanshaw was a pleasant looking woman in her mid-fifties who had spent her career looking in dark places. As a researcher at Harvard's Kennedy School of Government, her specialty was online radicalization and the pathways through which individuals were drawn to ideologically motivated violence, both religious and political.

Matthew Parker rose as soon as Dr. Hanshaw sat down after taking the oath.

"Your Honor, I'd like to renew our objection to this testimony." He had already filed a motion to block the expert testimony, which Judge Newton denied, but Parker wanted to send a message to the jury.

Judge Newton looked mildly irritated. "Thank you, Mr. Parker, the court is aware of the objection, which has been overruled, but I think this would be a good time for me to offer an instruction to the jury."

He turned his chair to face the jurors. "Members of the jury, normally the only witnesses permitted to testify in a case like this are *fact* witnesses, people who personally saw or heard or found something that is relevant to the case. But our rules of evidence recognize that there may be times when a different kind of witness is appropriate. In certain circumstances, a witness may testify from his or her expertise in order to explain something to you that you might not otherwise know from your

life experience. The government is calling this witness, who has studied, taught, and written about the way in which people become radicalized online, because they believe it will help you understand the evidence in this case. It is admitted for that purpose only and you should give it whatever weight you decide is appropriate. Please proceed."

Sean did the direct examination and, as with all good expert witnesses, he was soon almost invisible. After reciting her education, her honors, her areas of research, her countless hours trying to understand one of humanity's most disturbing impulses, she turned in her chair and spoke only with the jurors, who were mesmerized by her warm, friendly tone and plainspoken delivery.

All humans seek meaning and connection, she explained. We want to know we matter, that we are seen and loved. Most of us find those things through family, friends, church, school, or work—and usually a combination of those things. But there are those who, for a variety of reasons, don't find it and feel lost and unseen, without purpose. Those are people who are susceptible to messages that offer a sense of purpose through violence. Al Qaeda and 9/11 were largely pre-internet phenomena, but the Islamic State took full advantage of modern communication. During ISIS's peak in 2014 and 2015, the messages susceptible people heard and read online told them that the final battle between the faithful and unbelievers was at hand, that God had at long last established his prophesied caliphate on the Syria-Iraq border. The destiny of all believers was to come join the battle for the caliphate or, if they couldn't travel there, to serve the mission by killing unbelievers, the infidels, wherever they could be found. It was a noble calling, one with a divine mandate.

With a sad look, she explained that messages about violence always resonate more powerfully among young men. For a variety of reasons

related to brain development and hormones, young men find violence more attractive as a source of meaning than women or older men do.

The most effective radicalizing messages are those that tell consumers, especially young men, that they are special, that they are under siege, and that the noble course is to fight back against their enemies. It's a message that has worked for all human history, she explained. The Middle Ages had no social media, but recruiters still managed to convince thousands to leave their homes and fight a holy war in far-off Jerusalem. Of course, she added, the power of social media is that the recruiter doesn't need to ride on horseback to your medieval village; he's in your pocket reaching you constantly through your buzzing phone. It's an order of magnitude more effective, she said, and more dangerous.

She stopped there. Sean had instructed her that Judge Newton would not allow her to offer an opinion as to whether the poison Samuel Buchanan spewed was fertile ground for radicalization. "Too close to the question the jury needs to answer," the judge said, a ruling that Nora willed herself not to smile about, because this subject was the only fight she and Sean had during preparation for the case.

"We don't need her to tell the jury what's obvious," Nora had said during witness prep.

"It's not obvious," Sean had replied, his voice rising. "Ordinary people have a hard time believing that words on social media could get someone to kill. And weren't we worried about proving that Buchanan himself knew what he could accomplish with his words? Until we got the Gerardi tape?"

Case 4:26-cr-00016-FL-RN Document 54-4 Filed 08/18/26 Page 5 of 6

"Maybe," Nora answered, "but now that we have the tape, why take the risk that the court of appeals will think the expert testimony went too far?" *Jeez, what was that about brains and hormones and emotional regulation?*

Sean wouldn't back down. "It's reviewed under an abuse of discretion standard so they'll give Newton room. And, worst case, we argue it's harmless error because the other evidence was so strong."

"You do see how that actually supports my position, right?"

Sean went quiet, as he often did when angry. He was tired and worried. They all were. "Okay, Sean, you make the call," Nora said softly. *Judge Newton's never going to allow it anyway.*

Parker began his cross-examination in an odd way. "Dr. Hanshaw, let me start by thanking you for the work you have done to help humanity understand the threat of online radicalization."

Sean started to stand and object, but paused and sat down.

"Remind me how many years you have studied this topic?"

"Since right after the attacks of September 2001, although my focus didn't become internet-based radicalization until a few years later, with the explosion of the internet as a tool."

"It's a complicated topic, is that fair to say?"

"I think so."

"Which is why we rely on experts like yourself to help us sort it out, people who have spent years doing research, thinking, studying."

"I hope I'm useful."

"Oh, you are, doctor, you certainly are. Because it's not obvious that words on a smartphone screen could move someone to go kill another human being, is it?"