**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

No. 4:26-CR-00016-FL-RN

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **THE UNITED STATES' RESPONSE** |
| **v.** | ) | **IN OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION TO SUPPRESS AND FOR A** |
| **JAMES B. COMEY, JR.** | ) | ***FRANKS* HEARING (DE 39)** |
| | ) | |

## INTRODUCTION

A court should only grant the extraordinary relief of a *Franks* hearing when a defendant presents enough evidence to show an agent intentionally misrepresented a material fact beyond the substantial preliminary showing burden. He failed to come close here, so the Court should deny the motion.

Defendant seeks to suppress two search warrants the FBI obtained during its investigation and also requests a *Franks* hearing. *Franks v. Delaware*, 438 U.S. 154 (1978). [DE 39 and DE 40 at 16-17]. Defendant accuses the FBI agent of intentionally or recklessly omitting material facts and making false statements necessary for the magistrate to find probable cause. [DE 40 at 5-6][1]. Here, the Government simply presented facts and some rational investigative deductions to the magistrate who was free to accept or reject any interpretation as probative. The agent did not say anything untrue or inaccurately misled the magistrate. The Court should deny the motion to suppress and for a *Franks* hearing.

In his motion, Defendant relies heavily on three misplaced arguments. For both search warrants, Defendant complains that the Government failed to inform the magistrate

[1] Page references are to the ECF docketed page numbers not the page numbers of the original documents.

that it had sought evidence linking the mafia's or mob's use of the term "86" as meaning "kill." [DE 40 at 15-16]. However, lacking evidence during an ongoing investigation is not evidence of absence. Additionally, the search warrants sought evidence regarding Defendant's state of mind and other *mens rea* evidence. That was why, at least in part, they asked for the warrant. The Government need not already possess proof positive of those elements to establish the probable cause underpinning a warrant seeking that evidence.

Second, for both warrants, Defendant alleges the Government misrepresented Person 1's interviews with law enforcement in a manner designed to mislead the magistrate and did not reveal issues with Person 1's credibility. [DE 40 at 22-23]. Defendant ignores the fact that Person 1 makes two short appearances in the search warrant as part of the overall narrative of Defendant's actions, and not as a lynchpin of probable cause. [DE 40-1 at 36]. Both paragraphs referencing Person 1 could be removed in their entirety and the probable cause in the search warrants would survive. Regardless, any purported omissions about Person 1 in these affidavits are not the type so crucial to Person 1's credibility as to make that information unreliable.

Third, for the Apple search warrant, Defendant accuses the agent of "falsely impl[ying]" David Kelley obstructed the investigation. [DE 40 at 23-24]. The agent merely relates facts and relays her experience as relevant to why investigators were seeking access to Defendant's iCloud to obtain the original photograph. As a matter of fact, Defendant had not previously provided this to investigators. Instead of sending the original photograph, Defendant took a screenshot of the seashells photo, sent it to his lawyer, and his lawyer sent that screen shot to investigators. Defendant implies that the Government accused David Kelley of obstructing an investigation to manufacture this argument. The Government did not do that. Regardless, investigators routinely seek information to confirm voluntary alleged compliance to verify the facts. Thus, the same investigation would have happened here with

the request for all iCloud information from that discreet time frame even if Defendant and his lawyer had provided the photo in its original format earlier on.

Similarly, Defendant complains that the Government accused Mrs. Comey of lying to investigators by failing to tell them she Googled the meaning of 86 prior to Defendant's post. She did tell them that she did Google it after Person 1 contacted her a few hours later, but she did not mention her earlier search before Defendant posted the threat. [DE 40 at 25-26]. Again, the agent simply recited facts that led to her next investigative step of seeking Mrs. Comey's Google search history via warrant. Any suggestion that Mrs. Comey lied is made only by Defendant. Regardless, whether she lied, intentionally or accidentally omitted information, or simply forgot, the fact remains that investigators had ample reason to seek her Google search history to learn more about what she searched around the time that Defendant posted the threat.

Each purported justification for a *Franks* hearing or suppression fails as the statements and omissions Defendants objects to are not false or misleading, are not central to probable cause, nor are strawmen invented by Defendant to attack an FBI agent's integrity. The Government is entitled to investigate and gather evidence regarding the facts and Defendant's *mens rea* surrounding his posting of the coded message, "8647," to his 200,000 or so Instagram followers and to seek evidence of whether Defendant consciously disregarded a substantial risk that his post would be viewed as threatening violence against the sitting President of the United States.

Defendant fails to make the required substantial preliminary showing that the affidavits supporting two search warrants contain intentional false statements or *any* omissions, material or otherwise. He is not entitled to a *Franks* hearing. Nor is suppression warranted. The Court should deny the motion in its entirety.

## STATEMENT OF FACTS

The United States incorporates by reference the Statements of Facts in its responses in opposition to Comey's Motion to Dismiss for Vindictive and Selective Prosecution, Motion to Dismiss for Lack of a True Threat, and Motion to Suppress and for a *Franks* Hearing, which are being filed contemporaneously with this brief. The United States briefly recites relevant facts here.

On May 15, 2025, Comey was staying at a beachfront residence in Emerald Isle, North Carolina. Comey's novel "FDR Drive" was only five days from public release. As Publisher's Weekly described the novel, and as posted on Comey's Instagram, the protagonist is a federal prosecutor "trying to take down Samuel Buchanan, a far-right media personality with a popular podcast." FDR Drive, *Publisher's Weekly*, https://perma.cc/6V82-HQ9A4. [Exhibit 1] The prosecutor "believes Buchanan went far beyond the protection of the First Amendment when he singled out his enemies by name and suggested 'something should be done' about them. His fans have obliged, killing or grievously injuring some of his foes." *Id.* The novel itself describes the "stochastic terrorism" theory of Buchanan's offense at length:

> Sean nodded. "It's where a charismatic leader jacks people up but, through the wonder of the internet, avoids a direct connection to what comes next. *Stochastic* is a term from statistics that means you can estimate the likelihood of something happening, even if you can't predict who will do it and when and where."
>
> Jessica lifted her hand. "So it's like when King Henry II got Thomas Becket killed by simply saying, 'Will no one rid me of this meddlesome priest.?'"
>
> Benny laughed. Okay, now we're just makin' shit up. Kings? Priests? Stop. You guys have been drinking that Stolichnaya stuff."
>
> Sean smiled. "*Stochastic*, Benny. Definitely not vodka. And Jessica is spot on. But the fuller story of Henry II and Becket is closer to where I think we actually are. . . . I had to go look up the part I want to read you—what Henry *actually* said in front of his knights, after which they ran off and killed the Archbishop."

Sean looked down at his notes. "Nobody was taping stuff on iPhones in 1170, but the most reliable version is that King Henry looked at his nights and actually said, 'What miserable drones and traitors have I nurtured and promoted in my household who let their lord be treated with such shameful contempt by a low-born clerk!' And the famous part was added about four hundred years later: Will none of these lazy insignificant persons, whom I maintain, deliver me from this turbulent priest?"

Benny snorted. "So of course they go whack the guy. To the knights on his payroll, he's sayin' you're traitors and scumbags if you don't. That's about as close to an order as you can get. That's the way a Cosa Nostra boss would do it."

"Agreed," Sean said, "and we don't have anything that good on Buchanan. We could prove to a jury that King Henry *knew* they were going to go after Becket. He knew how the knights would react, given the way he spoke to them, which is damn good proof of his intent. But we actually can get pretty close to that here. I think we can prove—and no sheikh case pun intended here—that Buchanan is *willfully* blind to the individual attacks. He knows an attack will follow his words but he closes his eyes so he can say he wasn't part of it. Under the law, that willful blindness makes him as guilty as if he did the attack himself."

He turned back to the board and began drawing lines out from Buchanan's name, like the spokes of a wheel. "We can show five times he singled out someone, saying, in his word, 'They have to go' or 'They must be stopped.' Over and over again, he said that about a particular person—and within the overall context of 'Words aren't enough, people need to actually do something and take action.' And his listeners did exactly that—five times that we know of.

…

The room was quiet for a moment before Nora said, "But that's okay. I don't think we need to base his intent on the perfect-attack-record thing. I think we just argue that he *had* to know his words would result in the attacks. He may not have known the identity of his knights, but he knew they were out there and would act on his words. So he just shouted that they were—what were the king's words? 'Miserable drones and traitors'?—if they didn't get rid of the people he named. He knew what his knights would do. That should be enough to prove he intended it to happen.

"And don't forget, we have someone on the inside who saw it all happen, and she believes he knew what he was doing and wanted it to happen. What did Becky say the other day? Something about Buchanan talks like he's motivated

> by the cause, but he's really in it for the increased donations after each attack? It all fits."
>
> She looked at Jessica and Benny, who were nodding.
>
> "Fuckin' A," Benny mumbled.[2] [Exhibit 2]

Later in the book, a fictional expert witness researcher whose specialty is the online pathways through which individuals are drawn to ideologically motivated violence[3] testifies to a jury:

> Those are people who are susceptible to messages that offer a sense of purpose through violence. …With a sad look, she explained that messages about violence always resonate more powerfully among young men. For a variety of reasons related to brain development and hormones, young men find violence more attractive as a source of meaning than women or older men do. The most effective radicalizing messages are those that tell consumers, especially young men, that they are special, that they are under siege, and that the noble course is to fight back against their enemies. It's a message that has worked for all human history, she explained. The Middle Ages had no social media, but recruiters still managed to convince thousands to leave their homes and fight a holy war in far-off Jerusalem. Of course, she added, the power of social media is that the recruiter doesn't need to ride on horseback to your medieval village; he's in your pocket reaching you constantly through your buzzing phone. It's an order of magnitude more effective, she said, and more dangerous.[4] [Exhibit 3].

On May 15, 2025, a charismatic leader named James Comey, through the wonder of the internet, posted a coded message to his followers meaning "kill" or "get rid of" (a euphemism for "kill") President Trump. Comey has acknowledged taking the picture of the seashells on May 15. [Exhibit 4].

To be sure, Comey's account suggests any similarity between his conduct and his novel are coincidental. But he has claimed that he and his wife were on a beach walk and happened

[2] Comey, FDR Drive 62–63 (Mysterious Press, May 20, 2025).
[3] *Id.* at 218.
[4] *Id.* at 219–20.

upon seashells arranged in an "86 47" pattern. Of course, even if Comey did not arrange the seashells himself or plan his post in advance, that would not change the threatening nature of his post. But there is also reason to doubt his story and therefore his overarching credibility. The shells were located four miles down the beach from the beachfront property where Comey was staying, in an area separated from the ocean by a sand dune. And there is no evidence that anyone else arranged, photographed, or even saw the shells.

In any event, at 3:12 pm, Comey's wife sent him a screenshot including what appeared to have been a cropped definition of "U.S. English slang" indicating that "86" means "to get rid of or refuse service." [Exhibit 5]. Two minutes later, at 3:14 pm, Comey posted a picture of the seashells on his Instagram account with the caption "Cool shell formation on my beach walk."

There is no serious dispute that an objective viewer of Comey's post could read it to mean "Kill President Trump." Comey has admitted that the "47" referred to President Trump. And Cassell's Dictionary of Slang (2nd edition) defines "86" to mean:

> to throw out, get rid of (1940's), (1970) to kill, to murder to execute judicially, (1980) to be finished ready to leave or out of an item or be exhausted.[5] [Exhibit 6]

---

[5] At least one court has relied on Cassell's Dictionary of Slang. *United States v. Parker*, No.: 8:09-CR-0162, N.D.N.Y., August 7, 2009, *12, n.10 (2009 WL 2473510). Cassell's Dictionary of Slang has also been cited in multiple law journal articles, including: Yale Journal of Law & the Humanities, The Woman Will Be Out: A New Look at the Law in Hamlet, 20 YJLH 31, 59 at n.149 (Spivack, 2008); Houston Law Review, "Election" of Remedies: The City of Houston, the Sister Courts, and the Mission to Interpret the Tort Claims Act, 50 Hous. L. Rev. 1507, 1532 at n32 (Wischnewsky, 2013); Mississippi College Law Review, Four for the Fifth: The First Mississippi Judges on the Fifth Circuit, 34 Miss. C. L. Rev. 233, 243 at n.31 (Southwick, 2015); Yale Journal of Health Policy, Law & Ethics, Decentralizing STD Surveillance: Toward Better Informed Sexual Consent, 12 Yale J. Health Pol'y, L. & Ethics 1, 4 at n.19 (Fan, 2012); New York University Review of Law and Social Change, A 'Ho New World: Raced and Gendered Insult as Ersatz Carnival and the Corruption of Freedom of Expression Norms, 33 N.Y.U. Rev. L. & Soc. Change 43, 49 at n.22 (Inniss, 2009); Loyola of Los Angeles Law Review, Super Size me and the Conundrum of Race/Ethnicity, Gender, and Class for the Contemporary Law-Genre Documentary Filmmaker, 40 Loy. L.A. L. Rev. 687, 708 at n.84 (Austin, 2007), and; UIC John Marshall Law Review, "What I Said was 'Here is

The Wikipedia entry available to anyone who googled it on May 15, 2025 (last updated prior to May 15, 2025, on April 27, 2025), includes this excerpt: "According to Cassell's Dictionary of Slang, "to 86" also means "to kill, to murder; to execute judicially," likely referring to the size of a standard grave being 2.5 feet wide by 8 feet long and 6 feet deep. Other slang dictionaries confirm this definition."[6] It appears that the Wikipedia page for "86" has been modified hundreds of times since May 15, 2025, including over 100 times on May 16, 2025, alone.[7][Exhibit 7].

Similarly, on May 15, 2025, Merriam Webster.com had an article available titled "What does 'eighty-six' mean?" that included the following statement: "Among the most recent senses adopted is a logical extension of the previous ones, with the meaning of "to kill." We do not enter this sense, due to its relative recency and sparseness of use."[8]

Past news stories have also used the phrase "86" to describe killing.[9] And a former mob boss has informed the FBI that in his world, "everyone knew" that 86 meant "kill," and given Comey's experience as FBI Director, there is "no way that Comey did not know that." In any event, as noted above, in Comey's own novel "Nora" expressly uses the euphemism "get rid of" (and the novel generally uses other similar phrases) as equivalent to "kill."

When Comey's post appeared, there was immediate public outcry. Within a few hours, in Emerald Isle, at least two residents, one employed by the Police Department, notified the

---

where I can Cash in'" the Instrumental Role of Congressman Hatton Sumners in the Resolution of the 1937 Court-Packing Crisis, 54 IUC J. Marshall L. Rev. 379, 427 at n.282 (Daniel, 2021).

[6] *86 (term)*, Wikipedia, https://en.wikipedia.org/w/index.php?title=86_(term)&oldid=12-87585915 (April 27, 2025 entry).

[7] *Id.*

[8] Eighty-six, Merriam-Webster, https://www.merriam-webster.com/dictionary/86 (last visited Aug. 18, 2026).

[9] John Kifner, W*AR IN THE GULF: War Notebook; This Time, 'Good to Go' Is American Battle Cry*, N.Y. Times (Feb. 3, 1991), https://www.nytimes.com/1991/02/03/world/war-in-the-gulf-war-notebook-this-time-good-to-go-is-american-battle-cry.html.

Emerald Isle Chief of Police. At least one relative of Comey also understood the post's apparent meaning. The relative texted Comey's wife: "You guys have really gone off the deep end over the years with your TDS [Trump Derangement Syndrome]. 8647 is a call for violence no matter how you spin it. You should be ashamed of yourselves. . . . I hope Jim goes to jail for his crimes." Comey's wife responded denying that the post had been a call to violence. [Exhibit 8].

Comey deleted the post later that day. He has claimed he did so in response to the text from his relative. Comey also put up a new post stating:

> I posted earlier a picture of some shells I saw today on a beach walk, which I assumed were a political message. I didn't realize some folks associate those numbers with violence. It never occurred to me but I oppose violence of any kind so I took the post down.

While he initially refused to provide his address at the beach house to be interviewed on the night of May 15, Comey later told the Secret Service (which, along with the FBI, investigated the potential threat) that Comey had interpreted "86" as a term meaning to "ditch, dump, or replace" and "47" as representing President Trump. Despite Comey's experience in federal government, he did not explain how a second term President with a nearly evenly divided Congress could realistically be ditched, dumped, or replaced—that is, gotten rid of—through ordinary political means.

As the post continued to generate controversy, Comey sent a text message stating: "This is provoking me to be more vocal, which I will start next week in NYC (including a return to Colbert)." [Exhibit 9]. The next day, Comey's agent texted him: "Hey Jim, I'm sure you're dealing with a lot of BS right now. I have a message from ABC which I'll forward to you. Let me know if I can be of assistance." Comey responded quickly: "Thanks, it is truly crazy. But I'm not speaking to any media." A few minutes later, his agent wrote: "Also on the bright side you've gone viral." Comey quickly replied: "Not my intention, but I'll be OK if it

sells books." The agent responded: "Music to an agent's ears." [Exhibit 10]. In his interview to promote his new book with the Wall Street Journal published on May 23, 2025, Ellen Gamerman asked him: "Is there a universe where you did this to promote your book?" to which Comey responded: "Not in a universe I live in."[10]

On May 20, 2025, Comey appeared as a guest on the Late Show with Stephen Colbert to discuss his book release:

> Colbert: "You stirred up a little controversy recently. I was gonna say you landed in hot water, but it's just water. Because I don't know if you did this on purpose just to get attention here, but your Instagram this you were walking on the beach. What happened? You were walking on the beach, you saw this on the beach?"
>
> COMEY: "Yeah, my wife and I, Patrice, were walking on the beach and saw those numbers in shells on the beach."
>
> Colbert: "You didn't do this? Somebody else did this?"
>
> COMEY: "Yeah, somebody else did it. We were on a walk preparing for this week, the rollout of my book. She looked at it and said, "Why did someone put their address in the sand?" And we stood at it, trying to, looked at it trying to figure out what it was. And she had long been a server in restaurants and she said, "You know what, I think it is a reference to restaurants when you "86" something in a restaurant." And I said, "I would…"
>
> Colbert: "Right, its off the menu."
>
> COMEY: "yeah, nah I remember when I was a kid, you'd say "86" to get out of a place. This place stinks, let's "86" it."
>
> Colbert: "I was a bartender, you would "86" a customer if they were getting drunk. Like, let's "86" him, give him a low proof alcohol or something like that."

[10] Ellen Gamerman, *James Comey on His New Thriller, Those Seashells and That Signal Chat*, The Wall Street Journal (May 23, 2025), https://www.wsj.com/arts-culture/books/james-comey-seashells-trump-8647-book-fdr-drive-93dee8ed?msockid=03e31da23b0b6c242fc20a0c3ab66d68.

COMEY: "And so I said, "I think it's a clever political message." And she said, "You should take a picture of it." I said, "sure." And then she said, "You should Instagram that." And BOOM." [Exhibit 11].

Later in the interview, Colbert said: "OK, well congratulations on the attention for your book. There you go. That is a hell of a viral campaign."[11]

A grand jury returned an indictment against Comey charging him with violating 18 U.S.C. §§ 871(a), 875(c) for knowingly and willfully threatening to take the life of the President and transmitting that communication in interstate commerce.[12]

## ARGUMENT

### I. DEFENDANT IS NOT ENTITLED TO A *FRANKS* HEARING

"An accused is generally not entitled to challenge the veracity of a facially valid search warrant." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). *Franks* is a "narrow" exception. *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021). *See also United States v. Sanders*, 107 F.4th 234, 252 (4th Cir. 2024). To obtain a *Franks* hearing challenging a warrant, a defendant must make a three-part "substantial preliminary showing." *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019). First, a defendant must show that the affidavit contains a false statement or omission. *Id.* at 370, 374. Second, a defendant must show "intentional falsity or reckless disregard for the truth." *Id.* at 371. And third, "the defendant must show materiality—that is, that the false statements [or omissions] were 'necessary to the finding of probable cause,'" such that "when they are set aside, the remaining content was insufficient to establish probable cause." *Jackson v. Carin*, 128 F.4th 525, 534 (4th Cir. 2025); *see Franks*, 438 U.S. at 155-56, 171-72; *United States v. Glass*, 160 F.4th 53, 568-69 (4th Cir. 2025); *United States v. Pulley*, 987 F.3d 370, 376-77 (4th Cir. 2021);

---

[11] https://www.youtube.com/watch?v=KRs-KSczhOA.

[12] Federal Rule of Criminal Procedure 6(e) limits the government's ability to describe what information was presented to the grand jury. The government's recounting of some of the underlying facts of this case is not an admission as to what was presented to the grand jury.

*United States v. Moody*, 931 F.3d at 370-71 (4th Cir. 2019); *United States v. Lull*, 824 F.3d 109, 114-20 (4th Cir. 2016); *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627-28 (4th Cir. 2007), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990).

For each requirement, a defendant bears the "'heavy' burden" through providing "affidavits or other evidence." *Moody*, 931 F.3d at 370–71 (quoting *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008)). "[M]ere conclusory allegations" fall short. *Id.*; *see, e.g.*, *Franks*, 438 U.S. at 171 (defendant's "attack must be more than conclusory"). That "heavy burden is even harder to meet" when a "defendant relies on" a purported omission. *Haas*, 986 F.3d at 474. "[Omission-based attacks to affidavits trigger an even higher evidentiary burden than challenges based on false disclosures.]" *Glass*, 160 F.4th at 569 (4th Cir. 2025) (quotations and citation omitted); *see Moody*, 931 F.3d at 374. The defendant must demonstrate by a preponderance of evidence that (1) the affiant omitted the information with intent to mislead or with reckless disregard that the omitted material would mislead the judicial officer, and (2) the omitted information was material to the probable cause determination. *See Glass*, 160 F.4th at 569; *Pulley*, 987 F.3d at 376-77; *Hass*, 986 F.3d at 474-77; *United States v. Wharton*, 840 F.3d 163, 168-70 (4th Cir. 2016); *Lull*, 824 F.3d at 114-20; *Tate*, 524 F.3d at 454-55. "The omission must be *designed to mislead* or must be made in *reckless disregard of whether it would mislead*." *Tate*, 524 F.3d at 455 (cleaned up). "A showing that the officer acted negligently, or that the omission was merely an innocent mistake, *is insufficient to warrant suppression*." *Lull*, 824 F.3d at 115 (emphasis added); *see Pulley*, 987 F.3d at 377 ("What the officer-affiant *should* have known does not matter if he did not *in fact* know."). "[R]eckless disregard in the *Franks* context requires a showing that the affiant personally recognized the risk of making the affidavit misleading." *Pulley*, 987 F.3d at 377; *see e.g.,*

*Moretti v. Thorsdottir*, 157 F.4th 362 (4th Cir. 2025). For an omission to be material, its inclusion must defeat probable cause. *See Glass*, 160 F.4th at 569; *Moretti* 157 F.4th at 362; *Tate*, 524 F.3d at 455. Case agents " 'cannot be expected to include . . . every piece of information gathered in the course of an investigation.' " *Tate*, 524 F.3d at 455 (quoting *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (alteration in original)).

In assessing warrants and affidavits in support of warrants, the Supreme Court and the Fourth Circuit have emphasized that "warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation" and "must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor 'judged as an entry in an essay contest.' " *Moody*, 931 F.3d at 372 (quotations omitted); *United States v. Harris*, 403 U.S. 573, 579 (1971); *United States v. Ventresca*, 380 U.S. 102, 108 (1965), *Moretti*, 157 F.4th at 363; *United States v. Clenney*, 631 F,3d 658, 665 (4th Cir. 2011). "A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *Ventresca*, 380 U.S. at 108. The court "must refrain from nitpicking warrant affidavits with clarity afforded only by hindsight and the absence of an urgent, ongoing criminal investigation." *Glass*, 160 F.4th 568.

Defendant raises four issues that he incorrectly argues justify a *Franks* hearing: (1) that the case agent recklessly omitted information "disproving the Government's theory that [Defendant] must have known that '86' can mean 'kill' based on his experience prosecuting organized crime," [DE 40 at 19]; (2) Person 1's statements were "distorted," arguing that Person 1 did not *immediately* perceive "86" as having a violent meaning, but instead *eventually concluded* it as a "call to violence," and additionally, that the case agent did not mention what Defendant describes as Person 1's "express bias" or Person 1 receiving

rehabilitation treatment, [DE 40 at 22]; (3) that the case agent *implied* Defendant's attorney obstructed the investigation by not providing an original photograph with metadata in the Apple search warrant, [DE 40 at 23]; and (4) the case agent *implied* that Defendant's spouse lied about the timing of a Google search of the term "86" after versus before Defendant's post, [DE 40 at 25].

Defendant's arguments merely present "subjective disagreement[s] with how the affidavit characterizes the facts" based on affidavits provided by his attorneys, Patrick Fitzgerald and David Kelley – they do not constitute actionable *Franks* evidence. *Moody*, 931 F.3d at 370. For example, in one of the rare instances where the Fourth Circuit has found facts supported a *Franks* Hearing to probe the agent's candor in presenting information for a warrant and suppression of the warrant, the agent quite literally caught the sole witness in the act of stealing from the government in the immediate aftermath of serving as a confidential informant who purchased contraband. *Lull,* 824 F.3d at 114-20**.** So flagrant was this CI's actions, observed in person by the agent, that the agent immediately arrested the CI. About a half hour after arresting this CI, the agent wrote up an affidavit to support the warrant and submitted it to a magistrate. In doing so, the agent based the entire affidavit on the CI while utterly failing to mention any of that constellation of dishonesty the agent had just witnessed. The officer testified at the Franks hearing that they had determined the CI to be unreliable after the informant stole. *Id.* at 116. While a Franks Hearing in that context makes sense given the egregious events the agent eye witnessed, nothing remotely similar exists here.

Unlike *Lull*, the information about Person 1 that Defendant alleges matters here did not concern the investigation itself. Nor did it involve dishonesty or omission of contemporaneous dishonest behavior by the witness in the immediate presence of the agent.

Unlike *Lull*, the affiant/investigator did not affirmatively terminate or arrest the witness. As previously stated, the warrants do not rise and fall with the information related to Person 1. To the contrary, the Court can disregard all information related to Person 1, and each warrant still presented adequate probable cause.

Regardless, even a different recitation of facts, as suggested by Defendant, would not have defeated the low, practical standard for probable cause applied when seeking search warrants like these. *See Glass*, 160 F.4th at 570-71 (rejecting alleged *Franks* omissions by applying the probable-cause standard). Defendant fails to meet the heavy burden under *Franks,* so the Court should deny his motion.

**A. The warrant applications contained no reckless omission where the Government's ongoing investigation already included evidence that supported, and continues to support, that a meaning of "86" includes to "kill" as used in organized crime.**

Defendant's argument that the case agent acted recklessly by "omit[ing] information disproving the Government's theory that Defendant must have known that '86' can mean 'kill' based on his experience prosecuting organized crime" is simply false. The Government's theory has not been "disprove[n]". Defendant fails to recognize that a culpable mental state of recklessness suffices in this matter – that he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." This is the applicable standard under *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). Further, Defendant ignores the fact that proof of his state of mind at the time of the posting of his threat is not required to establish probable cause – the search warrants themselves state that they are seeking such *mens rea* evidence. [DE 40-1 and 40-2]. Under Defendant's theory, an investigator must already have all her evidence before seeking a search warrant to get additional information and potential evidence. If that was the standard, no investigator would ever be able to get a

search warrant to search for new information. This would be a perfectly circular, self-defeating bar to any search warrant, and it is not the law.

Regardless, Defendant fails to make the requisite substantial preliminary showing, that there was 1) an omission 2) that was intentionally false or made with reckless disregard for the truth, and 3) that the alleged omission was material - a false statement necessary to the finding of probable cause. *See Moody*, 931 F.3d at 370. Evidence of Defendant having direct contact with the term "86" in his professional career would be a proverbial "smoking gun" proof positive that Defendant affirmatively knew the meaning of "86" as kill. However, the absence of "smoking gun evidence" does not undermine probable cause in a search warrant designed to develop exactly that evidence.

Absent a defendant's confession, state of mind is often proved circumstantially. In run-of-the-mill criminal cases every day across the United States, prosecutors prove a defendant's state of mind by inference based on facts and context. The petit jury will decide whether the Government has proved Defendant's requisite *mens rea* for the crimes the grand jury indicted him for beyond a reasonable doubt at trial. But the absence of smoking gun evidence does not resolve the case even at trial, much less undermine probable cause for these search warrants while the investigation was ongoing.

The "heavy burden" imposed on a defendant under *Franks* "is even harder to meet" when a "defendant relies on" a purported omission to justify the disfavored motion. *Haas*, 986 F.3d at 474. Officers "'cannot be expected to include . . . every piece of information gathered in the course of an investigation.'" *Tate*, 524 F.3d at 455 (quoting *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (alteration in original)).

### 1. The Government's theory has never been disproven, certainly not at the time the warrants issued, and no intentionally false statement or omission made with reckless disregard for the truth exists.

Without doubt, if the Government finds the term "86" in a case file or transcript from Defendant's cases from his days prosecuting the mafia, that would be good evidence. But, the converse is not dispositive. The Government can prove Defendant's knowledge and intention or reckless mental state when he used the term "86" with other evidence. The absence of one specific type of evidence is not evidence of innocence. For Defendant to prevail in this motion, he must show the Court that any alleged omission must be *designed to mislead* or made in *reckless disregard of whether it would mislead*." *Tate*, 524 F.3d at 455 (emphasis added) (cleaned up). Even if there was any actual omission here at all, (which there was not), the facts do not support such a conclusion.

As detailed in the affidavits, sworn on March 23, 2026 (Apple) and May 20, 2026 (Google), the case agent knew that the term "86" had at least one meaning as murder or kill and is used in organized crime settings: "The post was reported to the USSS as a possible call for violence against President Donald J. Trump given the association of the numbers. Use of the number "86" to imply a specific meaning has been attributed to multiple origins and resulting meanings. The number "86" has been associated as a slang term having the meaning "to kill," and the number "47" is widely recognized as a reference to the 47th President of the United States of America, Donald J. Trump. Additionally, one common belief is that the term "86" originated within the restaurant industry to mean "to throw out, to get rid of, or to refuse service to."[13] More recently, the term has been attributed to an organized

[13] *See, e.g.*, What does "Eighty-Six" mean? Merriam-Webster Dictionary, https://www.merr-iamwebster.com/wordplay/eighty-six-meaning-origin; *see also What are the Origins of and meaning of '86'?*, The History Channel, https://www.history.com/articles/86-meaning.

crime context, in which it refers to taking someone "eight miles out of town" and putting them "six feet under."[14] [DE 40-1 at 30-31] and [DE 40-2 at 20].

Defendant began his career as an organized crime prosecutor for the United States in the Southern District of New York. He also served as United States Attorney for the Southern District of New York and Deputy Attorney General. Later in his career, Defendant became the Director of the FBI overseeing all criminal investigations. *Id.* Mr. Fitzgerald's Affidavit (Fitzgerald Affidavit), details how the Government's investigation was ongoing as of May 8, 2026, when former Gambino crime family underboss, Salvatore "Sammy the Bull" Gravano[15], revealed that "Defendant has to know what the term '86' meant 'as it related to killing someone.'" [DE 43, at 15, Para. 32]. The Fitzgerald Affidavit details how Gravano indicated he was "fairly certain it would be difficult to find the term '86' documented in law enforcement/FBI files because members of organized crime families refrained from using terms such as '86' that were commonly used in day-to-day business in the presence of law enforcement officers." [DE 43 at 15-16, Para. 32]. The Fitzgerald Affidavit further details that an interview on May 13, 2026, of the same witness indicated, that to him, "as a 'gangster,' it means 'to kill.'" [DE 43 at16, Para. 32].

Regardless, the term "eighty-six" has held a slang meaning since the 1970's as "to kill, to murder, to execute judicially," among other definitions. Jonathan Green, *Cassell's Dictionary of Slang – A Major New Edition of the Market-Leading Dictionary of Slang*, at 474

---

[14] *See, e.g.*, What Does '86' Mean? White House Reacts to James Corney's Post, Newsweek (May 15, 2025,9:28PM), https://www.newsweek.com/what-does-86-mean-trumn-iames-comev-instagram- 2073055.

[15] Defendant utilized Salvatore "Sammy the Bull" Gravano as a key cooperating witness in a high-profile organized crime prosecution, apparently having a sufficient basis to believe Mr. Gravano's testimony under oath without later revisiting it to undermine those convictions. DE 43, pg. 15, Para. 32.

(Cassell 2d ed.2005).[16] [*See* Exhibit 6 ] Another court has found the term "86" means "to kill." *Leach v. Mansfield*, Civil Action No. H-07-4331, S.D. Texas, February 10, 2010, *2 (2010 WL 707382)( "To 86 someone means effectively to kill him. 'The actual meaning comes from the size of a grave hole. 8' long, 6' deep.' Thus, the amalgam 'go 86' was an incoherent threat by Leach to kill his colleagues and supervisors."). The affidavit provided by Mr. Gleason is irrelevant for the purposes of a *Franks* Hearing as this information was unknown to the affiant at the time of the warrants. *See Pulley*, 987 F.3d.at 377 (holding what the officer/affiant knows is what matters, what he does not in fact know cannot attributed to him.)

The warrants sought additional information for the ongoing investigation relating to Defendant and his wife's research of terms, photos, and videos related to "86," "47," or "8647,"

---

[16] *Cassell's Dictionary of Slang* has been cited in at least the following matters: *United States v. Parker*, No.: 8:09-CR-0162, N.D.N.Y., August 7, 2009, *12, n.10 (2009 WL 2473510), an appellate brief before the United States Court of Appeals for the Second Circuit in *United States v. Bossinger*, No. 07-5718-cr, W.D.N.Y., September 4, 2008, *n5 (2008 WL 6136813), and in a trial court motion before the United States District Court for the District of Maryland in *United States v. Dinkins*, No. JFM-06-0309, D.M.D., April 22, 2009, *n1 (2009 WL 1468928). *Cassell's Dictionary of Slang* has also been cited in multiple law journal articles, including: Yale Journal of Law & the Humanities, *The Woman Will Be Out: A New Look at the Law in Hamlet*, 20 YJLH 31, 59 at n.149 (Spivack, 2008); Houston Law Review, *"Election" of Remedies: The City of Houston, the Sister Courts, and the Mission to Interpret the Tort Claims Act*, 50 Hous. L. Rev. 1507, 1532 at n32 (Wischnewsky, 2013); Mississippi College Law Review, *Four for the Fifth: The First Mississippi Judges on the Fifth Circuit*, 34 Miss. C. L. Rev. 233, 243 at n.31 (Southwick, 2015); Yale Journal of Health Policy, Law & Ethics, *Decentralizing STD Surveillance: Toward Better Informed Sexual Consent*, 12 Yale J. Health Pol'y, L. & Ethics 1, 4 at n.19 (Fan, 2012); New York University Review of Law and Social Change, *A 'Ho New World: Raced and Gendered Insult as Ersatz Carnival and the Corruption of Freedom of Expression Norms*, 33 N.Y.U. Rev. L. & Soc. Change 43, 49 at n.22 (Inniss, 2009); Loyola of Los Angeles Law Review, *Super Size me and the Conundrum of Race/Ethnicity, Gender, and Class for the Contemporary Law-Genre Documentary Filmmaker*, 40 Loy. L.A. L. Rev. 687, 708 at n.84 (Austin, 2007), and; UIC John Marshall Law Review, *"What I Said was 'Here is where I can Cash in'" the Instrumental Role of Congressman Hatton Sumners in the Resolution of the 1937 Court-Packing Crisis*, 54 IUC J. Marshall L. Rev. 379, 427 at n.282 (Daniel, 2021).

evidence related to state of mind, and certain communications, and additional information as detailed in the warrants. [DE 40-1 and 40-2]. No Government theory was disproved at that time, or now. No intentionally false omission exists, much less one made with reckless disregard for the truth. The evidence still supports that Defendant acted at least recklessly by consciously disregarding a substantial risk that his coded message of "8647" that he sent to his 200,000 or so Instagram followers, and the millions of secondary social media users who would view this as threatening violence against the President of the United States.

Defendant has not even approached the high standard of showing of reckless disregard where "the affiant personally recognized the risk of making the affidavit misleading." *Pulley*, 987 F.3d at 376; *see also Lull*, 824 F.3d at 115. Quite the opposite, nothing misleading exists at all in the affidavits, and the Government's investigative efforts have not disproved the investigative assertions and assumptions put forward in the affidavits. *Pulley*, 987 F.3d at 377; *See e.g., Moretti v. Thorsdottir*, 157 F.4th 362 (4th Cir. 2025). Thus, the Court should deny Defendant's motion for a *Franks* hearing.

**2. The evidence does not support any argument that there was a material omission related to the term "86."**

The Government had no requirement to include a lengthier recitation of its ongoing investigation, to include Defendant's commentary about the absence of "86" in transcripts from Defendant's one old mob case that were salvaged from sitting for decades in boxes at a New York courthouse and digitally uploaded. These are not material facts. They do not, and could never, defeat the low, practical standard for probable cause used to obtain a search warrant. *See United States v. Glass*, 160 F.4th 563, 570-71 (4th Cir. 2025) (rejecting alleged *Franks* omissions by applying the probable cause standard). Any inconclusive results of Government searches for "86" in certain case files or trial transcripts disprove nothing. As detailed above, the case agent detailed her awareness of "86" being used in organized crime

settings in the warrant applications. She also connected Defendant's significant work in organized crime investigations and prosecutions to the definition. Some of the searches Defendant complains were omitted from the affidavit for the Apple warrant had not been completed at the time she applied for that warrant. The Apple and Google warrants were sought and obtained during an ongoing investigation to gain additional information and evidence related to Defendant's state of mind at the time he posted his threat against the President.

Defendant has offered no evidence that the case agent made a "subjectively kn[owing]" omission that "would mislead the magistrate" in finding probable cause. *Haas*, 986 F.3d at 477. This Court has consistently held that this kind of "conclusory" argument fails to implicate a full *Franks* detour by the Court. *Id.* at 475. No material information was omitted at all.. *See Glass*, 160 F.4th at 569; *Moretti* 157 F.4th at 362; *Tate*, 524 F.3d at 455. Thus, the Court should deny Defendant's motion.

**B. Defendant's parsing of Person 1's statements and attacks on his credibility do not support a *Franks* hearing.**

Defendant scrutinizes the recounting of Person 1's statements, arguing it supports a *Franks* hearing based on whether Person 1 *immediately* perceived "86" as having a violent meaning, versus whether Person 1 *eventually* concluded the term "86" as a "call to violence." [DE 40, Pg. 22]. This example shows exactly why the Fourth Circuit does not allow the "nitpicking [of] warrant affidavits." *Glass*, 160 F.4th at 568. This complaint never approaches the high burden a defendant must present to successfully present a showing of a false statement; indeed, one that is intentionally false or a reckless disregard for the truth.

The recitation of the facts shows that Person 1 perceived "86" as having a violent meaning – the timeframe of that realization is inconsequential and not material to a finding of probable cause. Regardless, Person 1 acted upon his understanding of the violent meaning

of 8647 by reaching out to his family member, Mrs. Comey, less than three hours after Defendant posted the threat on Instagram, within an hour of Person 1 becoming aware it existed. The opening text by Person 1 to Mrs. Comey shows that the conversation immediately went to Person 1's belief that Defendant threatened violence against the President. There was no hesitation in Person 1's messages to Mrs. Comey from the get-go.

In any event, not discussing a fact that a witness may have gone to some type of rehab at some earlier time, well before and unrelated to the facts the agent relies upon this witness for in the affidavit, has no bearing on the magistrate's finding of probable cause. That attenuated context in this case does not make the witness utterly lack credibility like the tainted CI in *Lull*. The defense offers no rationale that having previously gone to some type of rehab at some point in the distant past shows how or why Person 1 lacks any credibility for what Person 1 did and observed in 2025, much less that Person 1 is utterly uncredible such that the magistrate must be given that context.

Further, any opinion by Person 1 as to what he "felt" Defendant "must have known" is expressed as just that in the affidavits – an opinion. The Government did not present Person 1's feelings as some definitive fact from an expert or as intimate knowledge or a confession of what Defendant's state of mind was at the time of his posting the threat. [DE 40-1 at 36]. The magistrate had information about Person 1's opinion and could weigh it accordingly when granting the warrant. Regardless, when Person 1 sent a text to Ms. Comey stating that Person 1 hopes Jim goes to jail for his crime, that is not any bias at all. Stating that a person who commits a crime should face punishment and jail time would not make a witness unreliable, and certainly would not defeat probable cause.

Finally, the agent provided the paragraph in question to the magistrate as background and completion of the story – notably, the paragraph before Person 1's opinion includes Mrs. Comey's statement denying that she understood the term to have a violent

connotation along with her actions to have Defendant remove the post once Person 1 alerted her of the violent meaning. [DE 40-1 at 36]. The magistrate had all of that information at the time of granting the warrant. Most importantly, if the entire paragraph in question regarding Person 1 was removed from the search warrant affidavits, nothing would change. Probable cause still exists. Therefore, it is not material, and the Court should deny the *Franks* motion.

### C. The case agent did not say that Defendant's attorney obstructed the investigation or that Defendant's spouse lied, but even if she had, it would not entitle Defendant to a *Franks* hearing.

Defendant argues that the case agent "implied" and was "suggesting" certain information in the warrant applications. He weaponizes his conjured inferences in a ploy to tilt against his strawmen to unjustifiably attack the warrant and the agent's conduct. [DE 40 at 23-26]. These strawmen are an even better example of Defendant attempting to "nitpick[] [the] warrant affidavits" from which courts should refrain. *Glass*, 160 F.4th at 568.

First, Defendant argues the affidavit "*recklessly implied*…that Mr. Kelley was hiding evidence from investigators" [DE 40 at 25] *(emphasis applied)*. It did not. The agent simply recited facts. The Secret Service agent asked for the photograph on May 23, 2025, at 9:53 a.m. Defendant, through his attorney, provided a screenshot of the original photograph of the 8647 on May 23, 205, at 2:29 p.m. Screenshot does not contain the same metadata as an original photograph. The agent next applied her training and experience to inform the magistrate that a method exists of taking a screenshot of a photograph instead of sending the original file format photograph to hide metadata. Insofar as Mr. Kelley, or Defendant himself, inferred that the agent accused them of obstructing the investigation, that is just their opinion. She did not say that.

An unsupported inference from David Kelley in his affidavit (Kelley Affidavit) does nothing to support Defendant's arguments. The Secret Service agent did not follow up in May

2025, or after, to obtain the original photograph with metadata. Mr. Kelley did not either. Undoubtably, either could have. Regardless, the agent seeking this warrant would have almost certainly requested this same information even if the original photo with metadata had been provided already. It is common, and common sense, for an investigator to ask for all relevant information from the custodian of the records as well as the user - Defendant. This allows an investigator to confirm from both sides instead of just relying on a defendant's representation that could be self-serving or incomplete. Additionally, the Kelly affidavit has no relevance as to a Franks determination in that it was unknown to the affiant at the time of the submission of the warrants. *Pulley*, 987 F.3d at 376-77.

Similarly, Defendant complains that the search warrant affidavit "*falsely implied* that [Mrs.] Comey lied to investigators." [DE 40 at 25]. (Emphasis added). To meet the standard for a *Franks* hearing, Defendant must show a false statement or omission that was a reckless disregard for the truth, *not* a reckless *implication* or false *implication* drawn by the defendant. *Lull*, 824 F.3d at 114. Defendant must also show that if such a false implication exists, it was also material. *Id.*

Again, the agent simply recited facts regarding Mrs. Comey's known statements to law enforcement and certain evidence that was not entirely consistent with her statements. "According to the Meta returns, Defendant posted the "86 47" post to Instagram at 3:14 pm, which was two (2) minutes after Patrice sent him a screenshot of definition of the term "86." The screenshot appeared to be of an Internet search of the term "86." During her interview with USSS, Patrice admitted that she performed a Google search of the term, but stated she did so after [Person 1] made her aware that the term "86" could be interpreted in a violent matter." [DE 40-2 p. 27]. The agent's recitation of the facts laid bare why probable cause existed to search of Mrs. Comey's Google search history to reveal evidence related to this investigation.

Apparently, Ms. Comey performed at least two Google searches, one before defendant posted his threat at 3:14 pm and one after Person 1 texted her around 6:05 pm EDT. But in her interview two days later, when she described what happened on May 15, 2025, she only mentioned the later search. This fact is relevant to the probable cause underpinning the affidavit. It could have been a simple omission by Mrs. Comey. Even if so, that aids in building probable cause for a warrant as much as a lie would. The difference between omission or lie is not material in the warrant. Defendant raises the specter of Mrs. Comey lying, not the agent. The facts speak for themselves.

Defendant makes no showing that these facts the agents recited in the affidavits are false. Whatever *implications* or *suggestions* Defendant subjectively perceives when reading the affidavit do meet the heavy burden required for a *Franks* hearing. In any event, the agent did not even say what Defendant accuses her of saying. These strawmen do not rise above the high hurdle of the required intentional falsity or reckless disregard for the truth regarding facts material to demonstrate probable cause.

Defendant additionally argues that there is something unusual about the agent including the screenshot paragraph in the earlier filed Apple warrant, and its "replacement" with the Mrs. Comey Google search paragraph in the Google warrant. [DE 40]. In the earlier-filed Apple warrant, investigators sought the original 8647 threat photograph from Defendant's iCloud account. They got it when Apple returned that warrant. Once they obtained it, the facts surrounding the provision of the screenshot instead of the original photograph had no relevance to obtaining the later-filed warrants for Defendant's Google account or his wife's search history.

Similarly, Mrs. Comey's discussion of Google searches in her May 17 Secret Service interview had no bearing on asking a magistrate to obtain access to Defendant's iCloud account. For obvious reasons, her statements in that May 17 interview are relevant for

obtaining her search history from Google in the later filed warrant. Once again, Defendant's implied wrongdoing does not exist here; the logic behind the differences in the quite different affidavits is readily apparent.

Defendant additionally argues "the usual explanation that the affidavit was drafted in the midst of 'an urgent, ongoing criminal investigation' simply does not apply here," *citing Glass*, 160 F.4th at 568. The defense cites no cases for it's proposition that the *Franks* standards for reviewing a warrant change for longer investigations. Electronic evidence is always subject to destruction, so time may be of the essence to preserve the evidence, especially once the target of an investigation becomes aware of its existence, or once an indictment is announced.

Again, Defendant fails to meet his "heavy burden" with a substantial preliminary showing of a false statement or omission, intentional falsity or reckless disregard for the truth, and materiality, that could possibly undermine these warrants or lead to a *Franks* hearing. *Moody*, 931 F.3d at 370–71. Thus, the Court should deny Defendant's motion to suppress or for a *Franks* hearing.

## CONCLUSION

For the foregoing reasons, Defendant failed to meet the "'heavy' burden" with a substantial preliminary showing of a false statement or omission, intentional falsity or reckless disregard for the truth, and materiality, for suppressing a *Franks* hearing. Thus, the Court should deny Defendant's motion.

Respectfully submitted this 18th day of August, 2026.

W. ELLIS BOYLE
United States Attorney

*/s/ Timothy M. Severo*
TIMOTHY M. SEVERO
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Tel: 919-856-4530
tim.severo@usdoj.gov
NC Bar no. 19621

**CERTIFICATE OF SERVICE**

I certify that on August 18, 2026, I caused the foregoing document to be filed electronically through the Court's CM/ECF system, which will send notification of the filing to all counsel of record.

TIMOTHY M. SEVERO
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Tel: 919-856-4530
tim.severo@usdoj.gov
NC Bar no. 19621